*817
 
 Opinion
 

 BAXTER, J.
 

 A jury convicted defendant Terry Douglas Bemore (defendant or Bemore) of one count of first degree murder (Pen. Code, § 187),
 
 [1]
 
 one count of robbery (§ 211), and one count of burglary (§ 459). Under the 1978 death penalty law, two special circumstance allegations were found true, namely, that the murder occurred during the commission of a robbery (§ 190.2, subd. (a)(17)(A)), and that the murder was intentional and involved the infliction of torture (§ 190.2, subd. (a)(18)).
 

 Following a penalty trial in front of the same jury that decided guilt, defendant was sentenced to death. The trial court denied the automatic motion to modify the verdict. (§ 190.4, subd. (e).) This appeal is automatic. (Cal. Const., art. VI, § 11; Pen. Code, § 1239, subd. (b).)
 

 No prejudicial error occurred at defendant’s trial. We therefore will affirm the judgment in its entirety.
 

 I. Guilt Phase Evidence
 

 A.
 
 Prosecution Case
 

 The crime occurred August 26, 1985, at the Aztec Liquor Store in San Diego. The victim, 55-year-old Kenneth Muck, was the lone clerk on duty and was responsible for closing the store at 10:00 p.m.—the approximate time of the robbery and murder.
 

 A small storage room in the back of the liquor store contained cleaning supplies, including commercial mops, and a safe sitting on the floor. A door opened from the storage room into a Dumpster area behind the building. The back door was unlocked only when trash was discarded, usually at closing time.
 

 Upon closing, Muck was required to transfer cash from the register to the top chamber of the safe. Muck did not know the combination to this chamber and could not retrieve money once it was deposited inside. However, all employees knew the combination to a separate bottom chamber of the safe, which held money placed in the register at the start of each shift. Money was wrapped in cloth bags tied with distinctive sailing knots by the owner of the store, Otto Heinkel.
 

 Muck was required to set the burglar alarm before leaving work each night. When this task was performed, a loud ring would alert persons in the
 
 *818
 
 store that the alarm had been set. An. alarm-on signal would also be received at the premises of a private security company.
 

 The time of the crime was established primarily through witnesses who lived nearby. Walter Cardwell testified that between 9:30 and 9:45 p.m. on August 26, he returned a plunger he had borrowed from the liquor store a short time earlier. During Cardwell’s return visit, Muck was otherwise alone, and the pair chatted for about five minutes. While walking between the store and his apartment, Cardwell saw a distinctive maroon Buick, later identified as defendant’s, parked in the lot in front of the store.
 
 [2]
 

 Another neighbor, Sandra McIndoe, testified that between 9:45 and 10:00 p.m., her roommate told her to look at something “odd” outside their bedroom window, which faced the Dumpster area behind the liquor store. There, McIndoe saw two people she could not otherwise identify standing around a “medium to large-sized sedan-type” car. Both McIndoe and a woman who lived in another building nearby testified that they did not hear the usual ring of the liquor store alarm at 10:00 o’clock the night of the crime.
 

 At some point after 10:15 p.m., the security company informed the store’s owner, Heinkel, that the alarm had not been set. Heinkel called an employee, John Riley, and asked him to investigate. When Riley arrived at 10:45 p.m., he unlocked the front door and saw that the cash register drawer was open and empty—its normal condition after money has been removed and placed in the safe at closing time. However, as Riley approached the storage room, he saw blood on the floor. He fled and called the police from a business nearby.
 

 The police found Muck lying dead on the floor of the storage room. There was a large amount of blood, including a smear or trail leading from the body towards the back door, which was open. The safe was gone, and striation marks suggested it had been dragged or pushed outside. Heinkel estimated that the safe contained “at least $1,200” when it was stolen, accounting for both “start-up” money in the bottom chamber and sales receipts in the top chamber.
 

 
 *819
 
 Detective Patrick Padillo testified that two sets of bloody shoe prints—one significantly larger than the other—were found in the storage room. Impressions made by the larger shoes were greatest in number and were located closest to the body. No bloody prints attributable to the smaller shoes, estimated to be men’s size eight, were found in the immediate vicinity of the body. Testimony by a shoe print expert, John Simms, and by an investigator for the district attorney’s office, Richard Cooksey, established that the larger set of prints were made by Puma tennis shoes—men’s size 13—bearing a particular herringbone pattern on the soles.
 

 The forensic pathologist who performed the autopsy, Dr. Robert Bucklin, testified that Muck was over six feet tall, weighed 188 pounds, and was in good physical condition before he died. The autopsy disclosed one blunt force laceration and several abrasions, mostly to the head. There were also 37 stab wounds distributed over Muck’s entire body.
 

 Almost half, or 17, of the knife wounds were located on the front and back of the torso. Dr. Bucklin identified one back wound and four chest wounds as “potentially fatal,” either individually or in combination. However, three of the latter wounds were particularly dangerous because they “blended” together on the chest, involved a great deal of force, and penetrated through the rib cage into the heart and lungs.
 

 The 20 remaining knife wounds—none identified as fatal—were located on Muck’s head, neck, arms, legs, hips, and buttocks. They included two punctate marks on the left side of the neck and one nick or cut to the jugular vein on the right side of the neck. Dr. Bucklin indicated that because pressure in the veins of a live person is much lower than pressure in the arteries, a cut to the jugular vein would produce only a momentary spurt of blood, which would be followed by a “slow gradual flow as opposed to [the continuous] spurting type flow which might be expected from [cutting] an artery.”
 

 Dr. Bucklin encountered two unusual circumstances during the autopsy. First, while four shallow cuts on the arms seemed defensive in nature, Dr. Bucklin found no defensive knife wounds on Muck’s hands—wounds commonly present in multiple stabbing cases like this one. Second, Dr. Bucklin observed a “cluster” of eight puncture and cutting wounds on Muck’s right lateral flank. These injuries were “distinct and different” from all other stab wounds because they were smaller, shallow, and irregular in shape.
 
 [3]
 

 As discussed later in the opinion, two knives were linked to defendant and the capital crime—a Dragon Taiwan knife identified as People’s exhibit No.
 
 *820
 
 48, and a Super Thrower knife identified as People’s exhibit No. 66. Dr. Bucklin testified that the eight wounds on Muck’s flank could have been made with People’s exhibit No. 48, given the size, shape, and rough finish of the blade. However, Dr. Bucklin believed the fatal knife wounds on Muck’s torso were inflicted with a different knife—one that created cuts with a “sharper,” more regular edge—such as People’s exhibit No. 66.
 

 Brian Kennedy, a deputy sheriff, testified as an expert in bloodstain pattern analysis, and reconstructed the crime in light of Muck’s injuries and the bloody scene. Kennedy believed Muck was probably seated upright on the floor—legs “drawn up” and feet bottoms “facing each other”—when “several blows” with the knife were delivered, including the nonlethal cut to his jugular vein. This conclusion was based on a single venal spurt pattern, as well as several miscellaneous spatter marks, on certain boxes; bloody crease marks in clothing on Muck’s lap; the presence of blood drops on the ankle area of his sock; a blood flow stain running down the shirt towards his lap; and a transfer stain caused when the bottom of his chin evidently hung down against his bloody shirt.
 

 According to Kennedy, additional stab wounds—including some of the injuries identified as fatal by Dr. Bucklin—were administered after Muck assumed the prostrate position in which he was ultimately found. Evidence supporting this conclusion included the large pool of blood underneath the chest cavity, and bloody “spine” marks projecting from the pool onto surrounding surfaces. Such blood loss and spining evidently occurred when the knife was driven violently into Muck’s chest while he was lying down, causing blood which had collected and started to clot underneath him to squirt sideways onto the floor, and driving clots onto the wall.
 

 Kennedy also believed Muck had been restrained during the attack— testimony consistent with autopsy evidence concerning the lack of defensive cuts on his hands. Several finger-size “compression marks” appeared in bloodstains circling the left wrist. A blood-free zone on the right wrist was roughly the size of a hand and, along with contact stains on the bicep, suggested that Muck’s right arm had been grabbed and held against his bloody shirt. Based in part on the fact that blood had started to clot before the stabbing was complete, Kennedy estimated that the 37 knife wounds were inflicted over a period of 15 to 30 minutes.
 

 Finally, there was no blood on the floor where the safe had been located, even though Muck was stabbed nearby. This fact, along with the bloody
 
 *821
 
 smear leading towards the door, suggested the safe was moved after most or all of the bloodletting had occurred. Kennedy inferred from the condition of the floor that a wet soapy mop had been pushed through the blood, perhaps in an effort to move the safe.
 

 In summer 1985, defendant rented a garage in an apartment complex on Bates Street in San Diego—a marginal neighborhood whose inhabitants generally knew one another and were involved in the sale and use of crack cocaine. Defendant’s friend, Jackie Robertson, and Robertson’s girlfriend, Patti Hill, shared a unit above defendant’s garage. Defendant also knew Troy Patterson (Robertson’s neighbor), Echo Ramey (Patterson’s roommate), Lloyd Howard (a local drug dealer), and Kim Strickler (Howard’s wife). However, the person with whom defendant apparently spent the most time was Keith Cosby (Robertson’s cousin and houseguest).
 
 [4]
 

 Howard regularly sold cocaine to defendant and Cosby. At some point on August 26, the night of the crime, defendant and Cosby separately visited the Howard home, apparently to buy drugs. Howard’s wife, Strickler, testified that she saw “fresh” scratch marks on defendant’s back, which was bare. Cosby’s shirt was bloody.
 

 Patterson and Ramey testified that they were home together from 9:00 p.m. through midnight on August 26. Shortly before midnight, defendant came to the door and asked to borrow something to cover a safe, like a large duffel bag. According to Ramey, defendant appeared wild-eyed, sweaty, and jumpy. Patterson followed defendant to his garage, and saw a safe resembling the one stolen from the liquor store.
 

 Robertson and Hill testified that after midnight on the same night, they heard banging noises and the sound of metal against metal coming from defendant’s garage downstairs. Early the next morning, Robertson entered the garage and saw the safe. Exterior parts had been removed, but both chambers were still locked. Throughout the day, various attempts to drill
 
 *822
 
 open the safe were made. Robertson and Patterson each admitted at trial that they assisted defendant and Cosby in this process.
 
 [5]
 

 While working on the safe, Robertson expressed curiosity about its origins. Defendant replied, “you don’t want to know” and “just stay out of it.” Defendant’s tone frightened Robertson, who then left the garage.
 

 When Robertson returned, the top chamber of the safe had been forced open. According to Robertson, he and Patterson were both present when defendant and Cosby brought the loot—two or three bank bags containing cash—into Robertson’s apartment. However, as best Robertson could recall, defendant and Cosby counted the cash in a bedroom by themselves. The empty money bags were later found by Robertson on a shelf above his refrigerator. Both Robertson and Patterson denied receiving any money from the safe.
 

 Robertson’s girlfriend, Hill, witnessed unusual behavior by defendant shortly after the safe first arrived in his garage. Before 7:00 o’clock in the morning, defendant asked to see Hill’s newspaper, which contained an article about the capital crime. Hill also saw defendant place a mop similar to the ones used at the liquor store in the Dumpster outside her apartment building. At Hill’s request, Robertson retrieved the mop, which Hill used to clean their apartment.
 

 According to Robertson, the safe sat in defendant’s garage for about two days. It was next seen by both Patterson and Ramey in a vacant apartment next to their unit, which was located in a building near defendant’s garage. Patterson testified that he became nervous about the proximity of the stolen safe to his residence. Hence, he and defendant put the safe in defendant’s car, drove to a remote residential area, and dumped it.
 
 [6]
 
 The damaged, empty safe was given to the police the next day by the owner of the property on which it was found. At trial, the safe was identified by Heinkel as the one stolen from his store.
 

 
 *823
 
 The capital crime remained unsolved through September and most of October 1985. During this time, Robertson found an unfamiliar knife— identified as People’s exhibit No. 48—in the apartment he shared with Hill. The knife was linked both to defendant and to the Aztec crime. Hill testified that the morning after the safe first arrived in defendant’s garage, she saw defendant at her kitchen sink washing an object that could have been People’s exhibit No. 48. As noted earlier, Dr. Bucklin testified that, based on the shape and finish of the blade, the same knife could have inflicted the shallow and irregular wounds clustered together on Muck’s right flank.
 

 On October 21, 1985, a local television show called
 
 Crime Stoppers
 
 sought information from the public about the Aztec crime on behalf of the San Diego Police Department. Hill promptly telephoned the program and conveyed her suspicions about defendant’s involvement. Robertson and Hill gave the police the mop that defendant had discarded in the Bates Street Dumpster, as well as the money bags and knife left in their apartment after the safecracking episode. According to Heinkel, the recovered mop and money bags were identical to items stolen during the capital crime.
 

 On October 26, 1985, several days after the
 
 Crime Stoppers
 
 broadcast, the San Diego Police Department encountered Cosby when he drove defendant’s car into the front yard of a house. The car was impounded. Detective Padillo testified that he subsequently acquired unspecified information leading him to believe that the impounded vehicle “had been used in the murder of Mr. Muck.”
 

 Pursuant to a warrant, Padillo seized items from the car, including two knives and two pairs of shoes. One of the knives was identified at trial as People’s exhibit No. 66—the same weapon that could have inflicted the fatal wounds on Muck’s torso. Although the shoes found in defendant’s car were not Pumas and did not match any prints at the crime scene, both pairs were quite large. One pair bore a size 13 label, and the other pair—though evidently unmarked—was similar in size.
 

 Other evidence linked defendant to the large shoe prints found close to Muck’s body and identified as size 13 Puma tennis shoes. Specifically, the three men who helped defendant drill the safe (Cosby, Robertson, and Patterson) have smaller feet and/or are shorter than defendant, who is six feet six inches tall.
 
 [7]
 
 In addition, Patterson testified that he gave defendant a new pair of size 13 Puma tennis shoes because he (Patterson) disliked their
 
 *824
 
 color and fit. Although Patterson was uncertain about the time, the shoes could have changed hands before August 26, the day of the Aztec crime. Patterson saw defendant wear the Puma shoes, which were black and red, on at least one unspecified occasion.
 

 Before his arrest on October 31, 1985, defendant purportedly made several statements indicating that he personally killed Muck, and that the stabbing occurred in order to facilitate the robbery. Howard, the drug dealer, heard defendant and Cosby discuss the Aztec crime while drinking beer with several other men on Bates Street. Cosby accused defendant of stabbing the victim for “no reason.” Defendant replied that if “he would have did what I told him I wouldn’t have had to stab him so many times.” Similarly, Angela Tabor, a woman who apparently helped Howard sell cocaine on Bates Street, testified that she saw the safe in defendant’s garage and witnessed an argument between Cosby and defendant, apparently over the Aztec crime. When Cosby said, “you didn’t have to do that,” defendant replied, “if the motherfucker had did what I told him he might still be alive.” Another woman who lived in the neighborhood, Latonya Wadley, testified that she and several neighbors, including defendant, were “getting high” together the morning after the capital crime. At one point, when she and defendant were alone, he said he “stabbed somebody” and inflicted as many as 20 wounds.
 
 [8]
 

 The prosecution presented similar testimony by Glenn Heflin, a convicted felon who met defendant in jail while he was awaiting trial in the present case. Heflin described three incidents between October 1987 and April 1988 in which defendant made statements suggesting he had personally killed Muck in the course of a robbery.
 
 [9]
 

 
 *825
 
 B.
 
 Defense Case
 

 1.
 
 Defendant’s testimony
 

 Defendant acknowledged that in August 1985, at age 29, he was an unemployed crack addict who committed shoplifting and armed robbery to support his habit. However, defendant denied being present during, or otherwise involved in, the robbery and murder of Muck. Defendant offered an alibi defense, and blamed Cosby and Patterson for the capital crime.
 

 Defendant testified that on the evening of August 26, 1985, he smoked cocaine on Bates Street with Cosby, Patterson, and “Johnny,” a drug dealer from Los Angeles whose last name defendant did not know. Shortly before 9:00 p.m., the group purportedly drove in defendant’s car to a Kmart in El Cajon, and discussed stealing merchandise that could be sold to earn money for more drugs. Because he carried a pistol, defendant suggested they rob a cashier instead. Defendant entered the Kmart alone to determine whether it was safe to rob. However, when he returned to the parking lot, his three companions had driven away in his car.
 

 According to defendant, he wandered aimlessly down the street. He soon arrived at a Wherehouse music store and committed an “easy robbery.” It was 9:00 p.m. at the time.
 

 Defendant was less precise in accounting for his time after 9:00 o’clock. He testified that he walked for a while, and then hired a taxicab to travel across town to “Imperial and 54th,” where cocaine is openly sold on the street. He explained, “If I would have purchased the cocaine on Bates [instead of Imperial], I would have had to share it with everyone .... They took no part in the robbery so I wasn’t going to share any [of its] fruits.” Defendant then taxied to Bates Street. Not seeing his car or friends, defendant smoked the cocaine by himself in a vacant apartment in Robertson’s building.
 

 
 *826
 
 When asked on direct examination about the scratches seen on his back that night by Strickler (Howard’s wife), defendant said they were acquired several days earlier during a fight “with a guy that I only know by the name of Tex.” Defendant claimed he bought cocaine from Howard on Bates Street on August 26 after consuming the supply purchased a short time earlier on Imperial Street. According to defendant, he smoked the second batch of cocaine in the same vacant apartment as the first batch, and consumed beer and marijuana on the latter occasion as well.
 

 While wandering around later the same night, defendant reportedly saw his car “coming up Bates Street” with Cosby, Patterson, and a bloody safe inside. Despite evidence suggesting that the safe was in the garage when Patterson first saw it, defendant claimed he helped Patterson and Cosby unload it from the car.
 

 Defendant’s account about opening the safe was similar to what both Robertson and Patterson had described at trial. However, contrary to evidence suggesting that only defendant and Cosby profited from the safe, defendant testified that money from both the top and bottom chambers was divided among three people—defendant, Cosby and Patterson. Defendant explained that his share represented compensation for use of his car.
 

 Defendant admitted abandoning the safe in the manner described by Patterson. Defendant also confirmed Hill’s account of his discarding the Aztec mop, saying “anything I could find that had anything to do with that crime I threw in the dumpster.” Defendant admitted that he owned the knives introduced into evidence as the probable murder weapons, and said they were usually kept in his car.
 

 However, defendant contradicted prosecution evidence with respect to other postcrime details. He purportedly never washed or left any of his knives in the Robertson/Hill apartment, and expressed no interest in reading about the capital crime in Hill’s newspaper. Although defendant acknowledged his feet ranged in size from
 
 11½
 
 to 13, “depending upon the shoe,” he denied owning or wearing Puma tennis shoes similar to those linked to the crime scene. Defendant also denied making any incriminating statements to Howard, Tabor, or Wadley on Bates Street, or to Heflin in jail.
 
 [10]
 

 On cross-examination, defendant disclosed that he did not know the distance and direction he walked between the Kmart and the Wherehouse;
 
 *827
 
 the nature of any statements he made to Wherehouse employees during the robbery; the amount of money he took from the Wherehouse; the location at which he hailed the taxicab; the name of the taxicab company he used; the name of the grocery store where he bought beer; or the length of time he spent consuming drugs and alcohol alone on Bates Street. Defendant also could not explain why he would consider robbing the Kmart when he knew there was a police station across the street, or why he would rob the Wherehouse even though he had no car or escape plan.
 

 Defendant offered the same basic excuse for any gaps in his story—poor memory and bad judgment as the result of heavy cocaine use. When the prosecutor asked why defendant played such an active role in concealing a crime he supposedly did not commit, and why Cosby and Patterson did not hide evidence of their own alleged involvement, defendant replied, “[T]hey’re more messed up [on drugs] than me. . . . They’re not covering anything, you know, and I’m loaded and I’m paranoid and I panicked.”
 

 2.
 
 Other defense witnesses
 

 Wherehouse employee Yolanda Salvatierra confirmed that she had previously identified defendant both at a police lineup and at a preliminary hearing as the man who robbed her at gunpoint around 9:00 p.m. on August 26, 1985. However, she made clear that such prior identifications were equivocal when made, and that she presently was “not sure” defendant committed the Wherehouse crime.
 
 [11]
 

 No evidence corroborated defendant’s account of his whereabouts after 9:00 o’clock on August 26, 1985. However, in an effort to suggest he was not present when the capital crime occurred around 10:00 p.m., defendant called John Verdugo, who lived near the Aztec Liquor Store and whose roommate (McIndoe) testified for the prosecution. Much like his roommate, Verdugo saw someone behind the store around the time of the crime, standing near a car similar to defendant’s. Because the view was obscured, Verdugo could not identify the suspicious person as defendant. However, like defendant, the person seen by Verdugo was Black, and could “easily” have been six feet six inches tall.
 

 
 *828
 
 C.
 
 Rebuttal
 

 Psychiatrist Reese Jones, an expert in psychopharmacology, was called to rebut any inference from defendant’s testimony that cocaine impairs memory, cognition, or the formation of criminal intent. Dr. Jones testified that cocaine increases confidence, “sharpens” mental acuity, and does not affect either the ability to distinguish right from wrong or to plan and premeditate conduct. The pleasurable effects are felt most rapidly by smoking the drug, as opposed to other means of ingestion. However, aside from irritability commonly experienced by all cocaine users, smokers encounter a special problem—“you come down ... so very very rapidly and get a feeling you want to have another dose . . . and so you go up and down.” Dr. Reese made clear that even during the low points, cocaine smokers function “in a reasonably normal state.” Severe cocaine intoxication can produce paranoid delusions, but is not typified by complete delirium or incoherence.
 

 The prosecution also sought to cast doubt on defendant’s claim that he was the person who robbed the Wherehouse one hour before the capital crime. Kimberly Rainer testified that she was working alongside defense witness Salvatierra when the gunman demanded money from the register. Although Rainer initially told police that the robber was about six feet four inches tall, she later determined that she had overestimated his height based, in part, on the fact that she never stood upright in his presence. Rainer did not identify defendant as the Wherehouse robber in the capital trial or, apparently, at any earlier point in time.
 

 Other evidence suggested that defendant could have committed the Aztec crime at 10:00 p.m. even assuming he robbed the Wherehouse at 9:00 p.m. Investigator Cooksey testified that, using the most direct route and obeying all traffic laws, the distance between the stores can be driven in 16 minutes.
 

 II. Penalty Phase Evidence
 

 A.
 
 Prosecution Case
 

 As reflected in jury instructions identifying permissible factors in aggravation, the prosecution relied on the circumstances of the capital crime (§ 190.3, factor (a)), and three subsequent, unadjudicated criminal acts involving violence or the threat of violence
 
 (id.,
 
 factor (b)). Evidence of one such act—intimidating inmate Heflin to prevent him from testifying about defendant’s statements concerning the robbery murder—was presented at the guilt phase. (See
 
 ante,
 
 fn. 9.) Evidence of the other two section 190.3, factor (b) crimes was introduced at the penalty phase, as follows.
 

 
 *829
 
 1.
 
 Assault on Mr. Oliver
 

 A
 
 married couple, the Olivers, testified that in October 1985, they visited an apartment building on Bates Street to retrieve a television borrowed by a friend. While Mr. Oliver socialized with a man named Ellis in the backyard, Mrs. Oliver saw defendant and two other men sitting on the Olivers’ car parked on the street out front. When she told them to move, defendant responded with profanity (e.g., “Bitch, don’t fuck with me”). He then followed Mrs. Oliver into the backyard, and argued with both Mr. Oliver and Ellis. At one point, defendant apologized to Mrs. Oliver and received her husband’s assurance that the incident was “over.”
 

 Nevertheless, when the Olivers loaded the television into the car a short time later, defendant approached holding a revolver and a wine bottle. He pointed the gun at Mr. Oliver’s head, threatened to shoot, and said “shut the fucking trunk.” When Mr. Oliver refused to comply, defendant hit Mr. Oliver with the wine bottle, breaking the glass and inflicting a forehead wound. Oliver fell to the ground, where he was hit with the bottle a second time and cut on the wrist. Meanwhile, a boisterous crowd gathered. The incident ended when several people, including Mrs. Oliver, “piled up” around defendant and Mr. Oliver. Defendant was somehow stabbed in the melee. Later, when the two men received treatment in the hospital emergency room at the same time, defendant threatened to kill Mr. Oliver and his family.
 

 2.
 
 Rape of Zelda C.
 

 Zelda C. testified that in the fall of 1985, she occasionally allowed Howard, the drug dealer, to conduct business in her Bates Street apartment in exchange for free cocaine. Late one night, Howard and his associates departed, leaving Zelda and her two young daughters alone in the apartment with defendant, a stranger. Although Zelda asked defendant to leave, he followed her into the bedroom and displayed a knife. He pushed Zelda onto the bed, cut her nightgown with the knife, and held the knife against her throat while engaging in a nonconsensual act of sexual intercourse. When she refused to orally copulate defendant, he masturbated and ejaculated on her. Throughout the incident, Zelda feared for herself and her children, who were asleep in another bedroom. Zelda testified that she promptly told her sisters and Howard about the incident—testimony corroborated by these individuals in the penalty trial. Ashamed and afraid, Zelda soon moved from Bates Street, and never contacted the police. While she had difficulty identifying defendant from photographs before trial, she positively identified him as the rapist in court.
 

 
 *830
 
 B.
 
 Defense Case
 

 1.
 
 Personal history
 

 Over 40 witnesses were called to present defendant’s life history. Defendant did not testify at the penalty phase.
 

 Defendant was born and raised in South Central Los Angeles. His parents never married or lived together. In 1956, when defendant was born, his mother already had four sons from a marriage that ended before she met defendant’s father. Defendant’s father rarely visited defendant as a child.
 

 In the early 1960’s, defendant’s mother stopped working and began receiving public assistance as the result of severe rheumatoid arthritis. She underwent numerous surgeries, used a wheelchair, and regularly took painkillers and other medications on which she may have become psychologically dependent. Defendant was close to, and protective of, his mother until her death in 1976.
 
 [12]
 

 Two siblings described the household as chaotic during defendant’s youth. Aside from Kenneth, who was shy and kind, defendant’s half brothers—Ray, Don, and Bobby—committed crimes, such as burglary, and spent time in custody as juveniles and/or adults. Don, who was particularly violent, once came home bleeding from a bullet or stab wound, and later died in a car accident. Bobby was an epileptic, and may have abused alcohol. Don and Ray both used illicit drugs at home, including heroin. Defendant reportedly smoked marijuana beginning at age nine or 10, and had his first sexual experience at age 11 or 12 with his sister-in-law, Ray’s wife. When defendant was no more than 12, he served as a lookout while Ray committed several burglaries.
 

 Two teenage cousins, Sharon and Cheryl, joined the household when their parents died in 1970. Sharon testified that the family often argued and rarely ate meals together. Defendant slept on the floor in the front room. There was little money for school clothes or extracurricular activities. Cheryl eventually married Kenneth, her cousin and defendant’s half brother.
 

 Defendant became interested in basketball at a young age. He was well-liked and well-behaved in grades 1 through 12. In high school, defendant
 
 *831
 
 became captain of a successful basketball team, was voted most popular boy in the senior class, and showed an interest in church and prayer. Witnesses providing such testimony included defendant’s high school coach, a minister’s family, and several school friends and teammates who had become successful adults, including a police officer, minister, professional basketball player, California Youth Authority counselor, and dentist. By some accounts, defendant drank beer and smoked marijuana in high school.
 

 Between 1974, when defendant graduated from high school, and 1979, defendant attended a series of community colleges and small four-year schools in Oregon, California, Kansas, and Kentucky. He received several basketball scholarships, and earned an associate of arts degree. Defendant forged strong personal relationships with coaches and teammates, many of whom described his good nature and expressions of Christian faith.
 

 While attending Pasadena City College in 1976, defendant met Bernetta, a cheerleader from a more privileged background. They married after she graduated from college in 1980, and stayed together until shortly before the capital crime. Bernetta testified that she never approved defendant’s marijuana “habit,” or fully understood his ability to “maintain” under its influence. A longtime friend disclosed that defendant became heavily involved in liquor and drugs, including PCP, after his mother died.
 

 In the first five years of marriage, two daughters were born, and defendant pursued various career paths. In 1980, he entered Bible college in Northern California and became a licensed Baptist minister. Largely for financial reasons, defendant decided to enter law enforcement. He graduated from the police academy in early 1982, and was hired as a police officer for the City of Palo Alto. He was terminated a few months later for reasons that may have included difficulty writing reports. Although the evidence suggested defendant’s substance abuse had stopped for a while, Bernetta testified that the habit resumed after he lost his job.
 

 In mid-1983, defendant joined the Army. Defendant was described by his sergeant as a “model” soldier while stationed for 18 months in Washington State. He was discharged in late 1984 for foot problems that may have stemmed from old basketball injuries. According to his wife, defendant became despondent and used alcohol while taking prescription drugs. However, when the family subsequently moved to San Diego, defendant acquired a new job that he “loved” and performed well—armed enforcement officer for the San Diego County Humane Society.
 

 Nevertheless, defendant underwent a destructive change beginning in April 1985. Bernetta noticed that defendant was unusually agitated, unable
 
 *832
 
 to account for time and money spent away from home, and became interested in obtaining a divorce. They separated in June, shortly before defendant admitted to Bernetta and another relative that he was addicted to cocaine. One high school friend who saw defendant around the same time noticed that he seemed different, and was accompanied by two apparent drug addicts— Keith Cosby and Jackie Robertson. In mid-August, defendant was arrested for shoplifting liquor from a supermarket, and was fired by the Humane Society when he failed to return to work. The capital crime occurred two weeks later.
 

 Evidence was also introduced concerning defendant’s conduct and character after he was arrested in the present case on October 31, 1985.
 

 Bernetta testified that she and the children regularly visited and exchanged letters with defendant in jail, and that defendant had written several poems. Consistent with her belief that defendant had been a “good husband” and “excellent father” even while abusing drugs, Bernetta testified that his family still appreciated and needed him.
 

 Five sheriff’s deputies who worked either in the courthouse (Fay) or county jail (Randall, O’Connor, Spina, and Quick) described defendant as a cooperative, respectful, and well-behaved inmate. Witnesses in the latter group testified that as jail trusty, defendant maintained an orderly tank, and served successfully in that position for at least two years—an unprecedented period of time. Three instances in which defendant had calmed irate inmates or otherwise assisted deputies were described. No deputy reported seeing gratuitous violence on defendant’s part. Sergeant Quick, who once prayed with defendant and observed his Bible studies, believed defendant’s expressions of Christian faith were sincere and that he would adjust in prison.
 

 Similar testimony was given by three chaplains who had counseled defendant in jail (De Hass, Olmsted, and Campbell), including one who knew defendant from Bible college. These witnesses uniformly held defendant in high regard, describing him as a man of “principle and faith,” who had “developed spiritually” in custody and brought “a sense of peace and calm” to the housing unit. Each chaplain believed defendant would continue ministering to others in prison as he had in jail, and that he would perform well in prison.
 

 2.
 
 Expert testimony
 

 Defense psychologist Stephen Bucky testified that distinctions could be drawn between “normal” families and families living with chemical dependency. Based on a postconviction interview with defendant and information
 
 *833
 
 provided by counsel, Dr. Bucky believed defendant had been raised in a family rendered dysfunctional by chemical dependency. As a result, defendant had difficulty identifying and expressing his feelings, considering the consequences of his actions, developing close and trusting relationships, and remaining steadily employed. On cross-examination, Dr. Bucky admitted that he had performed no psychological tests on defendant, that substance abuse is not necessarily genetic in origin, and that defendant displayed certain traits commonly found in sociopaths.
 

 C.
 
 Rebuttal
 

 The prosecution sought to rebut evidence suggesting that defendant maintained perfect order in the protective custody unit and never misbehaved while serving as captain. First, Deputies Rybka and Seitz testified that on June 8, 1988, defendant reported something wrong with dinner, inspiring other inmates to react wildly as though they had been poisoned and requiring medical checkups as a precaution. Inmate Juarez testified that he saw defendant pour toilet water onto his tray that night, and overheard defendant plotting in advance to sue the county or seek early release over the incident. Another inmate, Luken, saw defendant dump tobacco-tainted water into the beverage intended for the entire tank. Luken, who admitted receiving immunity for his role in the matter, testified that he discussed the plan to adulterate food with defendant beforehand, and that they hoped to “get out, escape” if sent to the hospital.
 

 Second, some of the same witnesses opined that defendant was manipulative and predatory as tank captain, and gave examples of conduct supporting this view. Specifically, Juarez, Luken, and another inmate, Wilson, testified that defendant and his “followers” threatened and assaulted inmates in order to obtain illicit drugs, cigarettes, and other scarce items. Defendant also used a variety of techniques to frighten and control newcomers, such as accusing them of being informants, making sexual advances while naked, and displaying his martial arts skills.
 
 [13]
 
 Although defendant read the Bible and held religious meetings, the witnesses perceived these activities primarily as a cynical means of ensuring favorable testimony at trial.
 

 In a related vein, Deputy Rybka opined that defendant was skilled at befriending and manipulating less experienced and more naive deputies like O’Connor and Quick, each of whom had given good character testimony on defendant’s behalf. Rybka also mentioned the general problem of having to remove inmates from the protective custody tank if they did not get along
 
 *834
 
 with defendant, though no specific fights were witnessed or reported by Rybka.
 

 D.
 
 Surrebuttal
 

 The defense called another group of inmates (Erickson, Moore, Stites, Holland, Castro, and Dunn) who confirmed defendant’s good nature and Christian faith, and placed contrary rebuttal evidence in context, as follows. Although defendant yelled and became angry when inmates broke the rules—particularly the ban on drugs—he did not otherwise commit violent or intimidating acts. The three inmates who testified on rebuttal disliked defendant because he refused to tolerate their disciplinary infractions. For example, defendant once disposed of drugs Juarez had smuggled into his cell, and intervened in disputes Luken and Wilson each waged with other inmates. With respect to defendant’s treatment of newcomers, these acts were described as “games” used primarily to fight boredom. Surrebuttal witnesses also maintained that defendant did not contaminate the meal on June 8, 1988, and that someone else could have done so because the food cart was not in its normal locked condition when it left the kitchen and/or arrived in the tank that night.
 

 III. Jury Selection Issues
 

 A.
 
 Effective Representation—Death Qualification
 

 Defendant contends various acts of ineffective assistance of counsel deprived him of a properly death-qualified jury, and violated his federal and state constitutional rights to due process and an impartial jury, and his right to a reliable penalty determination under the federal Constitution. We reject the claims.
 

 Defendant’s primary complaint is that his trial attorneys, lead counsel C. Logan McKechnie and cocounsel Elizabeth Barranco, did not vigorously participate in sequestered voir dire, and that an insufficient number of prospective jurors were examined and challenged for cause as a result. (See
 
 Hovey v. Superior Court
 
 (1980) 28 Cal.3d 1, 80-81 [168 Cal.Rptr. 128, 616 P.2d 1301]
 
 (Hovey).)
 

 [14]
 

 Counsel’s “nonparticipation” was purportedly so egregious as to constitute a “complete abdication” of the duty of competent representation.
 

 
 *835
 
 Viewed in context, jury selection as a whole occurred over a 10-weelc period. Present in court throughout this process, including death qualification, was Dr. Jo-Ellan Dimitrius, a jury expert assisting the defense.
 

 Our review discloses nothing perfunctory about
 
 Hovey
 
 voir dire in general, or about defense counsel’s performance in particular. (Cf.
 
 People v. Lewis
 
 (1990) 50 Cal.3d 262, 290-291 [266 Cal.Rptr. 834, 786 P.2d 892][no incompetence based on counsel’s participation in
 
 one-day
 
 voir dire in capital case].) Six and one-half weeks—or 65 percent—of the time spent selecting the jury was devoted to death qualification. Around 160 prospective jurors appeared during this phase and were not excused for hardship or by stipulation of the parties. Individual
 
 Hovey
 
 examinations—which consumed about 3,500 pages of the reporter’s transcript—followed the same basic pattern. The trial court first asked questions, and then gave both defense counsel and the prosecutor the opportunity to do so. Sometimes follow-up inquiries were made. No restrictions appear to have been placed on the number or nature of questions that could be asked. (Cf.
 
 People v. Tuilaepa
 
 (1992) 4 Cal.4th 569, 586-587 [15 Cal.Rptr.2d 382, 842 P.2d 1142] [approving
 
 Hovey
 
 voir dire limited to four questions with almost no follow-up inquiry by defense counsel].)
 

 Contrary to what defendant now claims, the record suggests his trial attorneys “participated fully in the process, and did so intelligently.”
 
 (People v. Freeman
 
 (1994) 8 Cal.4th 450, 485 [34 Cal.Rptr.2d 558, 882 P.2d 249, 31 A.L.R.5th 888] [rejecting ineffectiveness claim based on the nature and extent of counsel’s questions about capital punishment].) Defense counsel questioned at least 86 prospective jurors, including a large number of actual jurors in the case.
 
 [15]
 
 Counsel also exercised at least 34 challenges for cause, and vigorously opposed several prosecutorial challenges based on the individual’s views on capital punishment.
 

 Counsel’s decision to forgo questioning in some instances seems tactically sound on this record. (E.g.,
 
 People
 
 v.
 
 Freeman, supra,
 
 8 Cal.4th 450, 485; see
 
 People
 
 v.
 
 Smithey
 
 (1999) 20 Cal.4th 936, 986-987 [86 Cal.Rptr.2d 243, 978 P.2d 1171] [stating general rule that ineffectiveness claims are rejected on appeal unless “there could be no satisfactory explanation for counsel’s performance”].) Defendant’s attorneys typically remained silent when the
 
 *836
 
 examination otherwise revealed that a prospective juror did not strongly favor capital punishment, or was amenable to life imprisonment without parole. By not probing deeper into the matter, defense counsel reduced the risk of “antagonizing] the juror,” or exposing pro-life scruples that might “give the prosecution a reason to use a peremptory challenge or even grounds for a challenge for cause.”
 
 {People
 
 v.
 
 Freeman, supra,
 
 8 Cal.4th at p. 485; see
 
 People
 
 v.
 
 Cox
 
 (1991) 53 Cal.3d 618, 657-659 [280 Cal.Rptr. 692, 809 P.2d 351].) At bottom, nothing shows counsel was incompetent for the reasons urged by defendant.
 

 Defendant also complains that the defense had exercised only two of its 26 peremptory challenges when it expressed satisfaction with the 12-member jury. The implication seems to be that counsel did not meaningfully participate in this phase of jury selection, and that defendant’s jury was death prone as a result. We note, however, that defense counsel used two additional peremptories when the panel of six alternate jurors was chosen. The prosecution used a total of eight peremptory challenges in selecting all jurors, including alternates.
 

 “Because the use of peremptory challenges is inherently subjective and intuitive, an appellate record will rarely disclose reversible incompetence in this process.”
 
 (People
 
 v.
 
 Montiel
 
 (1993) 5 Cal.4th 877, 911 [21 Cal.Rptr.2d 705, 855 P.2d 1277].) We have consistently rejected complaints about either the failure to excuse prospective jurors on an individual peremptory basis, or the decision to accept the jury as constituted before exhausting such challenges. (E.g.,
 
 People v. Ochoa
 
 (1998) 19 Cal.4th 353, 448 [79 Cal.Rptr.2d 408, 966 P.2d 442];
 
 People v. Lucas
 
 (1995) 12 Cal.4th 415, 480 [48 Cal.Rptr.2d 525, 907 P.2d 373];
 
 People v. Cain
 
 (1995) 10 Cal.4th 1, 62 [40 Cal.Rptr.2d 481, 892 P.2d 1224];
 
 People
 
 v.
 
 Freeman, supra,
 
 8 Cal.4th 450, 486-487;
 
 People v. Montiel, supra,
 
 5 Cal.4th at p. 911;
 
 People v. Lewis, supra,
 
 50 Cal.3d 262, 290.)
 

 No different result is warranted here. Peremptory challenges were exercised only after both
 
 Hovey
 
 and general voir dire were complete, and the pool of prospective jurors had been passed for cause by both sides. The defense thus had the benefit of both the protracted examination process and any advice received from its in-court jury consultant. We see no basis on which to conclude that peremptory challenges were used in an unsound or uninformed manner.
 

 One particular exchange reinforces this view. Over the prosecutor’s objection, Defense Counsel McKechnie requested and received the court’s permission to use a photograph of the victim’s body during general voir dire.
 
 *837
 
 Counsel insisted he could not otherwise “intelligently exercise my peremptory [challenges] without knowing how people are going to react to this very bloody scene at the Aztec Liquor Store.” Counsel said he planned to rely on “body language” and “eye contact” generated by the photograph. Thus, contrary to what defendant suggests, it appears counsel placed special value on the peremptory challenge process, and viewed it as a nuanced means of selecting a suitable jury.
 

 Finally, defendant insists trial counsel viewed the death qualification process as merely a one-sided tool by which the prosecution eliminates potential jurors biased in favor of life imprisonment without parole: “Due to this fallacious interpretation of the critical importance of sequestered voir dire, trial counsel performed below the standards to be expected of diligent counsel in a death penalty case.”
 

 The record does not support the claim. The defense repeatedly made clear its intent to excuse individuals whose views in favor of capital punishment would “ ‘prevent or substantially impair’ ” their performance as jurors.
 
 (People
 
 v.
 
 Crittenden
 
 (1994) 9 Cal.4th 83, 121 [36 Cal.Rptr.2d 474, 885 P.2d 887], quoting
 
 Wainwright v. Witt
 
 (1985) 469 U.S. 412, 424 [105 S.Ct. 844, 852, 83 L.Ed.2d 841].) Counsel expressed this understanding both orally and in writing when presenting the trial court with reasons underlying numerous challenges for cause during
 
 Hovey
 
 voir dire. No fundamental misunderstanding of counsel’s role during this phase of trial has been demonstrated by defendant.
 

 B.
 
 Retention of Juror G.
 

 Defendant insists Mr. G., who sat on the jury, was biased in favor of the death penalty, and was unwilling to consider constitutionally relevant evidence offered in mitigation. According to defendant, the trial court erred in denying a defense challenge for cause made after Juror G. answered questions asked by the court and counsel on both sides during
 
 Hovey
 
 voir dire. He claims violations of his federal and state constitutional rights to due process and an impartial jury, and his right to a reliable penalty determination under the federal Constitution.
 

 It is settled that in order to preserve such claims, the defense either must exhaust its peremptory challenges and object to the jury as finally constituted at trial, or must justify its failure to do so on appeal.
 
 (People
 
 v.
 
 Waidla, supra,
 
 22 Cal.4th 690, 715;
 
 People v. Lucas, supra,
 
 12 Cal.4th 415, 480;
 
 People v. Bittaker
 
 (1989) 48 Cal.3d 1046, 1087 [259 Cal.Rptr. 630, 774 P.2d 659]; cf.
 
 United States v. Martinez-Salazar
 
 (2000) 528 U.S. 304 [120 S.Ct.
 
 *838
 
 774, 145 L.Ed.2d 792].) As noted, defendant remained in possession of most of his peremptory challenges at the time he accepted the jury—a panel which included Juror G. No justification for this failure to exhaust is made here.
 

 Defendant claims in the alternative that trial counsel was incompetent for failing to remove Juror G. by way of peremptory challenge. However, as suggested earlier, the decision whether to accept the jury as constituted is inherently nuanced and tactical. Nothing in the record shows that counsel’s actions were unreasonable or harmful in this regard. Indeed, whether the appellate claim concerning Juror G. is framed in terms of an erroneous denial of a challenge for cause or an incompetent failure to use a peremptory challenge, we see no evidence that he was biased or that he should not have served on the jury for the reasons defendant now suggests. (E.g.,
 
 People v. Lucas, supra,
 
 12 Cal.4th 415, 480-481.)
 

 On the one hand, defendant emphasizes answers to questions asked by the trial court in which Juror G. said he “can’t guarantee” that he would enter the penalty phase with an open mind, and that he would “probably” vote for death if first degree murder with special circumstances were found. In response to a question by defense counsel, the juror also said he was not opposed to the notion of “an eye for an eye,” at least where no mitigating evidence was available to “adjus[t]” his thinking in this regard.
 

 However, after making each of the foregoing statements, Juror G. insisted upon “explain[ing],” “elaborating],” and “clarifying]” his answers. He rejected any insinuation that he was a religious “fanatic,” and denied acceptance of the “eye for an eye” principle as literal truth. The juror also made clear that he hoped the parties would present evidence beyond the circumstances of the crime at the penalty phase, and that he would carefully consider and weigh such evidence. “Some actions,” he said, “are a combination of the person and the environment and a lot of other factors, and those are the factors that I could listen to . . . as an adjustment in my decision.” Finally, in response to questioning by the prosecutor, Juror G. specifically rejected the notion that he would always choose death, and said he would impose a sentence of life imprisonment without parole in an appropriate case.
 

 Deferring to the manner in which the trial court resolved any conflict or ambiguity in the juror’s answers
 
 (People v. Millwee
 
 (1998) 18 Cal.4th 96, 146 [74 Cal.Rptr.2d 418, 954 P.2d 990]), we see no predisposition in favor of a death sentence. The court did not err in implicitly finding no substantial impairment in Juror G.’s ability to function as a juror at the penalty phase.
 
 (People
 
 v.
 
 Crittenden, supra,
 
 9 Cal.4th 83, 121, citing
 
 Wainwright v. Witt,
 
 
 *839
 

 supra,
 
 469 U.S. 412, 424 [105 S.Ct. 844, 854].) We also cannot fault counsel for retaining Juror G. on this record, particularly since he expressed a willingness to consider background and character evidence bearing favorably on defendant. (E.g.,
 
 People v. Freeman, supra,
 
 8 Cal.4th 450, 486-487;
 
 People v. Montiel, supra, 5
 
 Cal.4th 877, 911.)
 

 IV.
 
 Guilt Phase Issues
 

 A.
 
 Torture-murder Special Circumstance
 

 Defendant contends the trial court’s refusal to dismiss the torture-murder special circumstance undermined the fundamental fairness of the proceedings at both the guilt and penalty phases.
 
 [16]
 
 Here, as below, the gravamen of the claim is that the evidence does not sustain the elements of the charge. The claim necessarily fails because there was sufficient evidence from which the jury could find the truth of the torture-murder special-circumstance allegation, as properly construed.
 

 In general, the torture-murder special circumstance embodied in section 190.2, subdivision (a)(18) (section 190.2(a)(18)), and applicable in the present case, authorizes death or life imprisonment without parole where the defendant is convicted of first degree murder, and where “[t]he murder was intentional and involved the infliction of torture. For the purpose of this section torture requires proof of the infliction of extreme physical pain no matter how long its duration.”
 
 [17]
 
 This version of the statute was enacted as part of the 1978 death penalty scheme, and was upheld against constitutional challenge in
 
 People
 
 v.
 
 Davenport
 
 (1985) 41 Cal.3d 247, 255, 260-271 [221 Cal.Rptr. 794, 710 P.2d 861]. Distilled, the statutory language requires intent to kill, intent to torture, and infliction of an extremely painful act upon a living victim.
 
 (Id.
 
 at p. 271.) The applicable statutory requirements are set forth in CALJIC No. 8.81.18, which was read to the jury in defendant’s case.
 
 [18]
 

 
 *840
 
 1.
 
 Infliction of extreme pain on live victim
 

 Defendant observes that the pathologist, Dr. Bucklin, gave no opinion concerning the order in which the 37 knife wounds occurred, or the point during the attack at which Muck died. Thus, with respect to the five deep wounds to the torso identified as fatal, defendant suggests there is no proof they occurred last or that Muck was alive when any of the other 32 cuts were made. Defendant also notes that Dr. Bucklin did not describe the degree of pain experienced by Muck before he died. Based on these factors, defendant claims there was insufficient evidence that Muck’s injuries would have caused extreme pain.
 

 We disagree. Testimony by Dr. Bucklin and Deputy Sheriff Kennedy indicated that Muck was sitting upright and was alive when his jugular vein was cut, causing blood to spurt onto surrounding surfaces. The jury could reasonably infer that the nonlethal jugular wound, and perhaps other knife “blows” mentioned by Kennedy, occurred in the first part of the violent episode, before Muck fell or was pushed into the prostrate position in which his body was ultimately found. According to Kennedy, it was only after Muck was lying on the ground that most of the fatal stab wounds—violent thrusts to the chest—were administered.
 

 Other evidence suggested that Muck was not only alive but also conscious when stabbed, at least during the first part of the attack. Evidence of a struggle was supplied by the “fresh” scratch marks that Strickier saw on defendant’s back, and by arm cuts that Dr. Bucklin identified as potentially defensive in nature. The jury could infer that Muck—a fairly large and vigorous man—remained a threat to his attacker even after he was stabbed and started to bleed. In particular, bloodstains suggested that both wrists were grabbed, and that he was prevented from using his hands to deflect the knife. No restraint would have been necessary if Muck had perished at the start of the attack in the manner defendant now suggests.
 

 As urged by the prosecutor in closing argument, the eight unusual wounds on Muck’s flank could also have been viewed as torturous by the jury. These cuts and punctures were uniformly shallow and grouped together in an area away from any vital organs. They also appear to have been inflicted with a knife other than the one used to fatally stab Muck in the torso during the latter part of the attack. The jury could conclude that the flank wounds were neither accidental nor lethal in nature, and that they were inflicted
 
 because
 
 
 *841
 
 the victim was alive, helpless, and capable of experiencing pain. (See
 
 People v. Barnett
 
 (1998) 17 Cal.4th 1044, 1076-1077, 1162 [74 Cal.Rptr.2d 121, 954 P.2d 384] [evidence of torturous acts supplied by numerous shallow cuts on the hip and thigh inflicted while the victim was alive and restrained].) The evidence supports a finding that the murder involved the infliction of extreme physical pain.
 

 2.
 
 Intent to inflict extreme pain
 

 Defendant next argues that any inference of an intent to cause extreme pain is speculative and unsupported by the record. According to defendant, no evidence bearing on the requisite mental state exists aside from the “condition of the victim’s body.” The argument seems to be that since multiple stab wounds can be as consistent with a rash explosion of violence as with an intent to inflict cruel suffering, the evidence is insufficient to sustain the torture-murder special-circumstance finding.
 

 However, as we have explained in rejecting similar claims in other cases, the trier of fact may find intent to torture based on
 
 all
 
 the circumstances surrounding the charged crime, including the nature and severity of the victim’s wounds and any statements by the defendant revealing his state of mind during the crime.
 
 (People v. Crittenden, supra,
 
 9 Cal.4th 83, 141 [torture-murder special circumstance];
 
 People
 
 v.
 
 Proctor
 
 (1992) 4 Cal.4th 499, 531 [15 Cal.Rptr.2d 340, 842 P.2d 1100] [same]; see
 
 People v. Raley
 
 (1992) 2 Cal.4th 870, 888 [8 Cal.Rptr.2d 678, 830 P.2d 712] [first degree torture murder];
 
 People
 
 v.
 
 Pensinger
 
 (1991) 52 Cal.3d 1210, 1239 [278 Cal.Rptr. 640, 805 P.2d 899] [same].) Contrary to what defendant suggests, there was sufficient evidence that he committed the crime with a “sadistic intent to cause the victim to suffer pain in addition to the pain of death.”
 
 (People
 
 v.
 
 Davenport, supra,
 
 41 Cal.3d 247, 271.)
 

 For background purposes, we note the evidence established the following chain of events: Muck was murdered during the course of a robbery, the object of which was money located in the Aztec Liquor Store. Entry of the store for this illicit purpose occurred around closing time, after money had been transferred from the register to the top chamber of the safe. Using his own knives and stepping in the victim’s blood, defendant stabbed Muck 37 times over a 15- to 30-minute period on the floor of the storage room near the safe. With apparent difficulty, defendant and a third person then moved the safe from the store to defendant’s garage on Bates Street. There, the safe was forced open after defendant and his Mends devoted substantial time and effort to the project. At trial, defendant admitted receiving money from the top and bottom chambers of the safe. Heinkel believed both compartments contained $1,200.
 

 
 *842
 
 Based on this chronology, and consistent with the prosecution’s closing argument, the jury could infer that defendant intentionally tortured Muck to gain entry to the safe and easy access to the cash while inside the store, and that Muck was killed after he failed to comply. Defendant’s postcrime statements to various witnesses indicated that Muck was stabbed because he did not cooperate with demands made during the robbery (“if he would have did what I told him I wouldn’t have had to stab him so many times”), and because he did not open the safe (“the stupid son-of-a-bitch should have opened the safe”). Other evidence established that Muck could not extract money from the top chamber of the safe because he did not know the combination. Also, since money was present in the bottom chamber when the safe was finally opened in defendant’s garage, an inference was raised that Muck refused access to this compartment even though he knew the combination.
 

 The painful series of flank wounds could readily be viewed as one means by which defendant sought to compel Muck to open the safe. As we have explained, autopsy and crime scene evidence suggests that these particular wounds were administered methodically rather than in a blind fury; that they were not inflicted with lethal intent or towards the end of the attack; and that the victim was alive and rendered incapable of resisting at the time. The jury could conclude that defendant repeatedly stabbed Muck in the flank as part of a calculated and cruel attempt to extract money from the safe before leaving the store, and before intentionally killing him as a potential witness to the robbery. (E.g.,
 
 People
 
 v.
 
 Crittenden, supra, 9
 
 Cal.4th 83, 108-109, 141 [evidence of torturous intent supplied by nonfatal premortum cuts inflicted on one victim as part of apparent effort to compel a second victim to execute a check payable to defendant].) We therefore reject defendant’s complaint about the sufficiency of the evidence of intent to torture.
 

 3.
 
 Relationship between torture and death
 

 Defendant next challenges the torture-murder special-circumstance finding on the ground the prosecution failed to establish a “causal relationship” between the intentional infliction of extreme pain and the murder. He insists that, to the extent the torturous acts merely facilitated the robbery and did not lead directly to Muck’s death, the murder could not properly have been found to “involve” torture within the meaning of section 190.2(a)(18).
 

 Defendant’s interpretation of the torture-murder special-circumstance statute is mistaken. As we recently explained, section 190.2(a)(18) applies “where ‘[t]he murder was intentional
 
 and involved the infliction of torture.
 
 ’ (Italics added.) Unlike section 189, which defines the crime of first degree
 
 *843
 
 torture murder as murder ‘perpetrated by means of . . . torture,’ thereby positing the requirement of a causal relationship between the torturous act and death [citations], section 190.2, subdivision (a)(18), does not by its terms require such a causal relationship. [Citations.] Because other types of murder, such as premeditated murder, also are defined as murder of the first degree, we believe the Legislature, by employing the broader language of section 190.2, subdivision (a)(18), intended to encompass (within the torture-murder special circumstance) acts of torture occurring within a larger time frame, including those that would not have caused death. [Citation.] We conclude the prosecution was not required to prove that the acts of torture inflicted upon [the victim] were the cause of his death.”
 
 (People
 
 v.
 
 Crittenden, supra,
 
 9 Cal.4th 83, 141-142, fn. omitted.)
 

 Defendant next argues that the torture-murder relationship contemplated by section 190.2(a)(18) does not adequately define or limit the class of persons eligible for the death penalty, and that the statute is unconstitutional as a result. (See
 
 Zant v. Stephens
 
 (1983) 462 U.S. 862, 878 [103 S.Ct. 2733, 2743, 77 L.Ed.2d 235];
 
 Godfrey
 
 v.
 
 Georgia
 
 (1980) 446 U.S. 420, 433 [100 S.Ct. 1759, 1767, 64 L.Ed.2d 398].) He seems to imply that, unless construed to require a causal relationship of the sort required for first degree torture murder under section 189, the phrase, “involved the infliction of torture,” in section 190.2(a)(18) is either too broad or too vague to meaningfully distinguish between those first degree murderers who deserve death and those who do not.
 

 We have rejected similar claims before. Section 190.2(a)(18) requires “some proximity in time [and] space between the murder and torture.”
 
 (People v. Barnett, supra,
 
 17 Cal.4th 1044, 1161 [construing and approving CALJIC No. 8.81.18 insofar as it summarizes the torture-murder special circumstance statute].) The statute obviously does not apply where “no connection” between the two events appears.
 
 (Barnett,
 
 at p. 1161.) Also, the torture-murder special circumstance renders death eligible only those first degree murderers who “intentionally performed acts which were calculated to cause extreme physical pain to the victim and which were inflicted prior to death.”
 
 (People v. Davenport, supra,
 
 41 Cal.3d 247, 271.) As so construed, section 190.2(a)(18) satisfies the Eighth and Fourteenth Amendments to the federal Constitution by providing a sufficiently narrow and rational basis on which to base eligibility for the death penalty.
 
 (People
 
 v.
 
 Barnett, supra,
 
 17 Cal.4th at p. 1162; see
 
 People v. Davenport, supra,
 
 41 Cal.3d at p. 270.)
 

 Finally, whatever the “outer limits” of the statute in this regard
 
 (People
 
 v.
 
 Barnett, supra,
 
 17 Cal.4th 1044, 1162), the instant record discloses a close connection between the torture and the murder. Muck was last seen alive at
 
 *844
 
 9:45 p.m. and the crime was first discovered at 10:45 p.m. During this one-hour period, defendant entered the liquor store, repeatedly stabbed Muck, and removed the safe with the help of a third person. The knife attack itself lasted about 15 to 30 minutes, and was confined to the storage room where the safe was located. Only a few wounds were individually life-threatening; most or all of these occurred towards the end of the violent assault. For reasons we have explained, many less dangerous stab wounds were evidently sustained in the first part of the attack while Muck was alive and being ordered by defendant to open the safe. Certain nonlethal knife wounds, such as those clustered on Muck’s flank, seem plainly calculated to cause extreme pain and to induce his cooperation. Whether these or any other acts deemed torturous by the jury actually caused Muck’s death, the murder “involved the infliction of torture” within the meaning of section 190.2(a)(18).
 

 B.
 
 Prosecutorial Comments About the Defense
 

 Defendant seeks reversal of the guilt judgment based on the manner in which the prosecutor referred in closing argument to defense counsel and counsel’s guilt phase strategy. The challenged remarks purportedly constituted misconduct under state law and violated defendant’s federal constitutional rights to present a defense, to due process, and to a reliable penalty determination. We reject the claims.
 

 Closing guilt phase argument began on Wednesday afternoon. During this session, the prosecutor observed that in opening remarks at the guilt phase, defense counsel had said defendant “ ‘does not wear size 13 shoes’ ” and could not have left size 13 shoe prints at the crime scene. Reference was then made to the various means by which defense counsel’s statement was contradicted at trial, e.g., evidence that defendant wore a pair of size 13 shoes given to him by Patterson, evidence that other size 13 shoes were found in defendant’s car, and testimony by defendant that he can wear size 13 shoes. The prosecutor commented, “Gone is the argument that my client really does have size 11 feet, [¶] . . . This argument that my client doesn’t have size 13 feet or wear size 13 shoes kind of starts to unravel a bit. . . . [¶] . . . Now we’re going to have to focus on some other defense. Have to admit he does have size 13 feet.”
 

 Next, the prosecutor discussed the observations of witnesses near the liquor store shortly before the crime occurred. In so doing, he continued the theme he had used in discussing defendant’s shoe size. “So we have defense two. . . . My client’s car wasn’t at the crime scene.” The prosecutor proceeded to highlight testimony by Cardwell and Verdugo, indicating that
 
 *845
 
 they saw a car like defendant’s parked in front of, and then behind, the liquor store at the critical time.
 

 Immediately thereafter, the prosecutor made the following remark: “Then there was another change, [¶] . . . My client does have size 13 feet. Okay, my client’s car was at the crime scene[,] but my client wasn’t in it. He was doing his version of Marco Polo, wandering all over El Cajon after pulling [the Wherehouse] robbery [from which] he had no means of escap[e].” At this point, court was adjourned for the evening.
 

 The next morning, Thursday, the prosecutor did not resume his discussion of defendant’s version of events between the time the Wherehouse and Aztec crimes occurred. Instead, after reviewing evidence placing defendant’s car near the liquor store, the prosecutor reconstructed the murder based on bloodstain and autopsy evidence, linked defendant to the knives that were likely used in the crime, and discussed incriminating conduct and statements attributed to defendant afterwards. Following a midmoming recess, the prosecutor returned to a subject he had discussed the previous day—the size 13 Puma shoes worn by both defendant and the killer: “[Patterson] gave them away and he gave them to Terry Bemore, who also happens to wear, despite his attorney’s previous denials, he does wear size 13 shoes.”
 

 Immediately after the last comment was made, defense counsel requested and received a conference outside the hearing of the jury. Counsel complained that, for the “third time,” the prosecutor had committed misconduct by accusing counsel of “changing defenses,” and by implying that “some sort of dirty trick” was being played on the jury. Counsel also claimed that he had never “denied” defendant wore size 13 shoes, and that the prosecutor was wrong insofar as he said the contrary was true. After hearing argument from both sides, the trial court overruled the objection.
 

 Based on all transcript references quoted in the preceding paragraphs, defendant claims the prosecutor improperly impugned the integrity of opposing counsel and undermined the fundamental fairness of the proceedings. According to defendant, the prosecutor accused counsel of concocting various defenses as evidence unfolded at trial, and implied counsel knew such shifting defenses were untrue. Defendant also suggests that, aside from denigrating counsel, the prosecutor falsely insinuated the jury had witnessed a midtrial change in the defense theory of the case.
 

 Such arguments have not been preserved by timely, contemporaneous objection in the trial court.
 
 (People
 
 v.
 
 Welch
 
 (1999) 20 Cal.4th 701, 753 [85 Cal.Rptr.2d 203, 976 P.2d 754];
 
 People
 
 v.
 
 Gionis
 
 (1995) 9 Cal.4th 1196,
 
 *846
 
 1215 [40 Cal.Rptr.2d 456, 892 P.2d 1199].) Almost all of the comments challenged here occurred over the course of an afternoon session in which no objection by defense counsel was raised. Not until midmoming the next day—after jurors contemplated the disputed remarks overnight, and after the prosecutor repeated earlier comments about defendant’s shoe size—was an objection on grounds of misconduct made. Under the circumstances, the trial court had no opportunity to consider the objection and give appropriate admonitions when the alleged misconduct first occurred, or to prevent additional remarks of a similar nature from being made. Hence, the issue has been waived on appeal. (See
 
 People v. Mickle
 
 (1991) 54 Cal.3d 140, 187 & fn. 31 [284 Cal.Rptr. 511, 814 P.2d 290] [defendant waited too long to contest victim impact evidence where two witnesses gave such testimony one day, and where no objection was made until a third witness was prepared to give similar testimony the next day].)
 

 In any event, no misconduct occurred. It is generally improper for the prosecutor to accuse defense counsel of fabricating a defense
 
 (People
 
 v.
 
 Perry
 
 (1972) 7 Cal.3d 756, 789-790 [103 Cal.Rptr. 161, 499 P.2d 129];
 
 People v. Bain
 
 (1971) 5 Cal.3d 839, 845-847 [97 Cal.Rptr. 684, 489 P.2d 564]), or to imply that counsel is free to deceive the jury
 
 (People v. Bell
 
 (1989) 49 Cal.3d 502, 538 [262 Cal.Rptr. 1, 778 P.2d 129]). Such attacks on counsel’s credibility risk focusing the jury’s attention on irrelevant matters and diverting the prosecution from its proper role of commenting on the evidence and drawing reasonable inferences therefrom.
 
 (People v. Sandoval
 
 (1992) 4 Cal.4th 155, 183-184 [14 Cal.Rptr.2d 342, 841 P.2d 862], citing
 
 People
 
 v.
 
 Thompson
 
 (1988) 45 Cal.3d 86, 112 [246 Cal.Rptr. 245, 753 P.2d 37].)
 

 Nevertheless, the prosecutor has wide latitude in describing the deficiencies in opposing counsel’s tactics and factual account. (See
 
 People
 
 v.
 
 Frye
 
 (1998) 18 Cal.4th 894, 977-978 [77 Cal.Rptr.2d 25, 959 P.2d 183] [no misconduct where prosecutor accused counsel of making an “ ‘irresponsible’” third party culpability claim];
 
 People v. Medina
 
 (1995) 11 Cal.4th 694, 759 [47 Cal.Rptr.2d 165, 906 P.2d 2] [no misconduct where prosecutor said counsel can “ ‘twist [and] poke [and] try to draw some speculation, try to get you to buy something’ ”].) In so doing, the prosecutor may highlight the discrepancies between counsel’s opening statement and the evidence. (E.g.,
 
 People v. Gionis, supra, 9
 
 Cal.4th 1196, 1217.) Misconduct claims also have been rejected where the prosecutor anticipates the flaws likely to appear in counsel’s closing argument based on evidence that was introduced (e.g.,
 
 People v. Thompson, supra,
 
 45 Cal.3d 86, 113), and where the prosecutor criticizes the defense theory of the case because it lacks evidentiary support (e.g.,
 
 People v. Fierro
 
 (1991) 1 Cal.4th 173, 212 & fn. 9 [3 Cal.Rptr.2d 426, 821 P.2d 1302]).
 

 
 *847
 
 Here, the prosecutor did not misrepresent events witnessed by the jury in open court. At the start of the guilt phase, defense counsel made the statement later attributed to him by the prosecutor, to wit, defendant “does not wear size 13 shoes.” Defense counsel also said in his opening statement that the suspicious vehicle seen near Aztec Liquor Store shortly before the crime “wasn’t [defendant’s] car.” Moreover, the prosecutor argued accurately that both assertions were contradicted by evidence adduced at trial. Testimony from several witnesses, including defendant, established that he owned and wore size 13 shoes, while neighbors such as Cardwell placed defendant’s car near the crime scene at the critical time. Hence, the record supports the prosecutor’s suggestion in closing argument that counsel could not reasonably adhere to prior claims concerning defendant’s shoe size and car, and that incriminating evidence introduced at trial on both topics had undermined the defense’s original theories.
 

 The prosecutor also did not accuse counsel of dishonesty in presenting a defense. Contrary to defendant’s claim on appeal, the prosecutor never stated or implied that defense counsel knowingly made false statements or promises in his opening remarks. Overall, the prosecutor’s theme was simply that he had proven defendant’s identity as the killer beyond a reasonable doubt, and that the alibi and related evidence offered by the defense were not persuasive. By referring to counsel in the first person and alluding to defenses not supported by the evidence, the prosecutor simply employed a rhetorical device calculated to focus the jury’s attention on strong circumstantial evidence of guilt and on any corresponding weaknesses in the defense case. No improper attack on counsel’s personal integrity or professional tactics could reasonably be gleaned from such remarks.
 

 V. Penalty Phase Issues
 

 A.
 
 Effective Representation—Mitigation and Rebuttal
 

 Defendant contends trial counsel’s strategy with respect to “good inmate” evidence in mitigation violated his federal constitutional rights to competent representation, due process, and a reliable penalty determination. For reasons we explain, the judgment should not be reversed on this ground.
 

 1.
 
 Background
 

 As noted, the defense presented testimony by five deputy sheriffs concerning defendant’s good attitude and behavior in custody, especially with respect to his ability to follow and enforce the rules as tank captain. On cross-examination, four of the deputies were asked whether they had heard
 
 *848
 
 about defendant’s involvement in a food contamination incident in jail, and whether they were involved in any investigation thereof. Although each witness admitted hearing rumors concerning such misconduct, they denied any personal or official knowledge of the matter. While such cross-examination was underway, the trial court instructed the jury not to consider the truth of any such rumors, and to use the information solely to evaluate the deputies’ opinions of defendant.
 

 Immediately after the deputies testified, and before three chaplains described defendant’s spiritual activities and progress in jail, lead counsel McKechnie moved in limine to prevent the prosecution from admitting evidence of the food contamination incident on rebuttal. The court and counsel discussed the proper scope of rebuttal outside the jury’s presence when the motion was first made, and again on numerous occasions during the chaplains’ testimony and up until completion of the defense case in mitigation.
 

 These discussions indicated that a criminal complaint had been filed in municipal court about one year earlier charging defendant and three cellmates with adulterating jailhouse food, with falsely reporting that a poisoning had occurred, and with conspiring to commit such acts. The trial court in the present case learned that McKechnie had represented defendant at a preliminary hearing in the food tampering case, and that the complaint had been dismissed because there was no evidence that a “poison or harmful substance” had been used or that “knowingly” false complaints were made within the meaning of the charged statute. (See § 347, subds. (a) & (b).) The preliminary hearing transcript, which was provided to the trial court and is included in the record on appeal, suggested at least two motives behind the alleged poisoning—manufacturing grounds for a lawsuit and obtaining early release from jail.
 

 McKechnie argued that fundamental fairness and res judicata principles prevented the penalty jury from being allowed to consider misconduct which had been the subject of a dismissed criminal complaint. Counsel also claimed that the food tampering incident was merely a harmless prank that had no tendency in reason to rebut evidence portraying defendant as a nonviolent person who posed no danger if spared the death penalty. Various other grounds were asserted in support of the motion in limine, including the prosecution’s failure to include the food poisoning incident in its notice in aggravation (see § 190.3), and the risk that a mini-trial on the topic would consume undue time and confuse the jury (see Evid. Code, § 352).
 

 In opposing the motion, the prosecutor confirmed his intent to present evidence that defendant masterminded the food tampering incident, and that
 
 *849
 
 he generally behaved in an aggressive and manipulative fashion as captain of the tank. The prosecutor relied on the well-settled notion that he could rebut particular character traits offered as a basis for mercy, and that he was not bound in this effort by the statutory factors in aggravation or by his pretrial notice of aggravating evidence. (See
 
 People v. Rodriguez
 
 (1986) 42 Cal.3d 730, 791-792 & fn. 24 [230 Cal.Rptr. 667, 726 P.2d 113], citing
 
 People
 
 v.
 
 Boyd
 
 (1985) 38 Cal.3d 762, 775-776 [215 Cal.Rptr. 1, 700 P.2d 782].) According to the prosecutor, the proffered evidence would undermine testimony by the deputies and chaplains portraying defendant as a cooperative inmate and exemplary trusty who behaved well in jail and would conform in prison.
 

 Before the trial court ruled on the matter, cocounsel Barranco made certain statements giving rise to the issue now raised on appeal. Barranco— who claimed primary responsibility for handling defense evidence at the penalty phase—said that when she made the “strategic decision” to introduce evidence of defendant’s good conduct in jail, she did not “worry about the food poisoning [incident] because there’s no basis for it.” She expressed surprise over having just learned through McKechnie and the prosecutor that the municipal court complaint in the food tampering case had been dismissed for reasons other than a finding of “factual[ ] innocen[ce].” Barranco blamed herself for not learning “more about that case” and for instead relying on “rumor [and] hearsay.” Barranco indicated that she would not have introduced good inmate evidence “at all” had she known the food tampering incident “had happened” and “could come in ... as the last evidence the jury hears before they deliberate penalty.” Barranco denied throwing herself “on the sword” of incompetence “as a last resort,” saying she simply wanted to create a record for any future habeas corpus proceeding.
 

 After taking the matter under submission, the trial court issued a lengthy ruling from the bench denying defendant’s request to exclude evidence of the food tampering incident and authorizing rebuttal along the lines proposed by the prosecution. The court noted that while a capital defendant has a statutory and constitutional right to present relevant evidence bearing on his good qualities as an inmate, decisional law specifically allows the prosecution to respond with evidence suggesting that the contrary is true. (Citing
 
 People v. Malone
 
 (1988) 47 Cal.3d 1,31 [252 Cal.Rptr. 525, 762 P.2d 1249];
 
 People v. Lucero
 
 (1988) 44 Cal.3d 1006, 1026-1027 & fn. 12 [245 Cal.Rptr. 185, 750 P.2d 1342];
 
 People
 
 v.
 
 Gates
 
 (1987) 43 Cal.3d 1168, 1211 [240 Cal.Rptr. 666, 743 P.2d 301].) Based on this line of authority, defense counsel’s suggestion that rebuttal should be limited to violent adjudicated acts, as opposed to a broader range of disruptive tendencies, was rejected. The trial court also rejected as unpersuasive any claim of “great surprise” by
 
 *850
 
 the defense that the prosecution would seek to present the food tampering incident and related evidence, or that the court would grant such a request. Finally, the court reserved the right to exclude cumulative and marginally relevant matters offered on rebuttal under Evidence Code section 352; granted a defense request for additional time to prepare surrebuttal; and granted a prosecution request to bar evidence of the municipal court’s findings in the food poisoning case.
 

 As set forth earlier in the opinion, the prosecution’s rebuttal evidence fell into two categories: (1) evidence that defendant tampered with dinner and disrupted the cellblock (though witnesses did not necessarily agree on whether toilet or tobacco water was used, and whether defendant was motivated by civil damages, early release, or escape); and (2) evidence that defendant feigned spirituality and engaged in duplicitous, threatening, and even physically assaultive behavior against other inmates in order to maintain control as captain and to serve his own selfish needs. In turn, surrebuttal evidence suggested that inmates testifying on rebuttal were biased against defendant, were lying or mistaken when they accused him of contaminating food and faking Christianity, and had exaggerated his aggressive acts.
 

 At the end of the penalty phase, the trial court gave various instructions limiting the manner in which the foregoing evidence could be used. On the one hand, the jury was told that “mitigating factors are unlimited,’’ and include the extent to which defendant “adjusts in a prison or custodial institution,” and the “[s]trength and depth of [his] religious beliefs.” On the other hand, the instructions made clear that reports of bad conduct in jail elicited on cross-examination of defendant’s good character witnesses “are not evidence that the reports are true,” or that defendant behaved “inconsistently with good jail behavior.” Similarly, the jury was told that evidence “offered solely to rebut mitigating evidence may not be considered as aggravating evidence, but may only be used to determine the truth, weight, or validity of the mitigating evidence.” As noted, only one misdeed in custody was identified as an aggravating factor—evidence offered in the prosecution’s case-in-chief concerning intimidation of inmate Heflin as a witness in the capital case.
 

 2.
 
 Analysis
 

 Defendant first argues that, in light of Barranco’s assessment of her own performance, the decision to present good inmate evidence was flawed because it was based on inadequate investigation of the facts giving rise to food poisoning charges, and the reasons underlying dismissal of those charges in municipal court. The argument seems to be that trial counsel
 
 *851
 
 would not have opened the door to admission of this disruptive incident or to other unfavorable rebuttal evidence if the omission identified by Barranco had not occurred.
 

 However, evidence concerning the food tampering incident, standing alone, could not have fundamentally altered defense strategy or otherwise deterred a reasonably competent attorney in Barranco’s position from presenting substantial mitigating evidence of defendant’s life in custody. Nothing in the record indicates that Barranco was unaware of all the other evidence admitted on rebuttal, including various threatening and assaultive acts similar to conduct described by inmate Heflin at the guilt phase. (See
 
 ante,
 
 fn. 9.) Indeed, by negative inference from Barranco’s remarks, the defense went forward with its case in mitigation, and decided to inform jurors of defendant’s good qualities as an inmate, despite its awareness that the prosecution could rebut with a sizeable body of previously unpresented evidence placing his jailhouse behavior in an unfavorable light. For this reason, Barranco’s claim that admission of the food tampering evidence was a surprise material to her entire strategy carries little weight on appeal. We decline to find ineffective assistance of counsel on this narrow ground.
 

 Defendant argues more broadly that trial counsel’s decision to present “good inmate” evidence invited a “bad inmate” rebuttal of greater weight, and was thus incompetent. Defendant claims that no effective attorney, aware as trial counsel was, or should have been, of all potentially damaging rebuttal would have introduced any evidence bearing on defendant’s positive qualities as an inmate.
 

 However, the decision to present mitigating evidence at the penalty phase, and thus risk unfavorable revelations on rebuttal, calls for a tactical judgment not normally second-guessed on appeal. We generally defer to such decisions, and assume trial counsel properly weighed the relative risks and benefits.
 
 (People
 
 v.
 
 Ervin
 
 (2000) 22 Cal.4th 48, 101 [91 Cal.Rptr.2d 623, 900 P.2d 506];
 
 People v. Ochoa, supra,
 
 19 Cal.4th 353, 468; see
 
 People v. Freeman, supra,
 
 8 Cal.4th 450, 513;
 
 People v. Gonzalez
 
 (1990) 51 Cal.3d 1179, 1251 [275 Cal.Rptr. 729, 800 P.2d 1159].) Nothing in the record demonstrates that competent counsel, armed with the information defendant’s trial attorneys knew or should have known, would necessarily have reached a different conclusion on the matter.
 

 In any event, none of the acts or omissions characterized as incompetent by defendant could have prejudiced him at sentencing. (See
 
 Strickland
 
 v.
 
 Washington
 
 (1984) 466 U.S. 668, 691-696 [104 S.Ct. 2052, 2066-2069, 80 L.Ed.2d 674];
 
 People v. Fosselman
 
 (1983) 33 Cal.3d 572, 584 [189 Cal.Rptr.
 
 *852
 
 855, 659 P.2d 1144].) We reach this conclusion first by comparing the penalty trial that actually occurred, including evidence introduced about defendant’s life in jail, with the penalty trial defendant would have received if no such evidence had been presented in mitigation, rebuttal, and surrebuttal.
 

 As we have seen, the jury heard new information on rebuttal—offered primarily by inmates who were portrayed as biased and untruthful on surrebuttal—about defendant’s shrewd and predatory behavior as captain and his possible involvement in a bizarre food tampering incident. This new bad inmate evidence tempered the strong praise defendant received from several law enforcement officers and chaplains who testified on his behalf, and could have raised concerns in jurors’ minds as to whether defendant would be dangerous or prone to escape if sentenced to life imprisonment without parole. However, had trial counsel proceeded in the manner defendant now suggests and withheld
 
 all
 
 good inmate evidence, the life history presented in mitigation would have ended with defendant’s descent into cocaine addiction and his commission of the gruesome crime against Muck. In other words, the penalty jury would have received
 
 no
 
 information from which it could infer that defendant was willing or able to conform in prison, and could have placed undue weight on the jailhouse assault on Heflin admitted in the prosecution’s case-in-chief (see
 
 ante,
 
 fn. 9). It is not reasonably probable that a more lenient sentence would have been imposed under such circumstances.
 

 We reach no different conclusion based on the overall effect of rebuttal at the penalty phase. In addition to the assault on Heflin (see
 
 ante,
 
 fn. 9), the prosecution sought a death sentence based on the capital crime and the violent acts later committed on Bates Street while defendant was addicted to cocaine. The defense responded with comprehensive evidence suggesting that, until shortly before the capital crime, defendant had worked to overcome his troubled childhood, and had performed fairly well as a college athlete, minister, police officer, soldier, husband, and father. Defense evidence further suggested that defendant’s respect for authority and interest in religion had reemerged after his arrest in this case, and that he could conform in a structured custodial setting.
 

 To the extent the prosecution established that defendant may have abused his position as captain and behaved in an aggressive or disruptive fashion in jail, such rebuttal evidence could not have materially affected the foregoing balance of factors in aggravation and mitigation. The jury was already aware that defendant had threatened and assaulted at least one cellmate. More importantly, the jury knew from the court’s instructions and the prosecutor’s
 
 *853
 
 argument that evidence admitted on rebuttal was not aggravating and, at most, merely offset defendant’s good inmate evidence—a discrete segment of the case in mitigation. We find no reasonable probability that any ineffective assistance of counsel permitting the introduction of such rebuttal evidence affected the penalty determination.
 

 B.
 
 Prosecutorial Comments on Lack of Remorse
 

 In closing argument at the penalty phase, the prosecutor first critiqued mitigating evidence offered by the defense, and urged a death sentence based on countervailing evidence in aggravation, particularly the “horrible” nature of the capital crime. The prosecutor then identified two factors as bearing solely on the weight of evidence offered in mitigation, namely, bad inmate rebuttal testimony discussed earlier in the opinion, and defendant’s failure to express remorse for the capital crime.
 

 Argument on the latter issue was brief, and proceeded as follows: “Did you hear a single word of remorse uttered by Mr. Bemore when he testified? Now, that’s not a factor in—.” Before the prosecutor could complete the sentence, defense counsel interrupted and asked for “a sidebar, please.” The trial court said, “that’s not necessary. Let [the prosecutor] complete his statement.” The prosecutor resumed his argument, saying “that’s not a factor in aggravation, but you can consider the lack of remorse, balancing it against factors in mitigation.” Defense counsel remained silent, neither challenging these remarks nor renewing the request for a sidebar conference.
 

 Almost three months later, after the death verdict was announced, defendant moved orally and in writing for a new penalty trial on the ground the prosecutor committed misconduct in making the statements quoted in the preceding paragraph. The defense insisted it was unfair for the prosecutor to fault defendant for not expressing remorse for a crime he denied committing at the guilt phase, and as to which a lingering doubt instruction had been given at the penalty phase. In discussing the matter at length with the parties, the trial court seemed disinclined to find misconduct based on the applicable case law. However, the court denied the request for a new trial primarily because defendant had “waived” any misconduct claim by not objecting and requesting a curative admonition once the prosecutor finished discussing defendant’s lack of remorse.
 
 [19]
 

 Defendant now claims the prosecutor’s remarks violated his privilege against self-incrimination because they alluded to his failure to take the
 
 *854
 
 stand at the penalty phase, confess guilt, and express remorse. (See
 
 Griffin
 
 v.
 
 California
 
 (1965) 380 U.S. 609, 613-615 [85 S.Ct. 1229, 1232-1233, 14 L.Ed.2d 106];
 
 People
 
 v.
 
 Coleman
 
 (1969) 71 Cal.2d 1159, 1168-1169 [80 Cal.Rptr. 920, 459 P.2d 248].) Defendant also asserts the prosecutor committed
 
 Boyd
 
 error
 
 (People
 
 v.
 
 Boyd, supra,
 
 38 Cal.3d 762, 771-776) by invoking lack of remorse as a nonstatutory aggravating factor, and
 
 Davenport
 
 error
 
 (People v. Davenport, supra,
 
 41 Cal.3d 247, 288-290) by misrepresenting the absence of mitigating evidence of remorse as aggravating. Related federal and state due process claims are based on the notion that the prosecutor injected an irrelevant and impermissible factor into the penalty determination. (See
 
 Zant v. Stephens, supra,
 
 462 U.S. 862, 885 [103 S.Ct. 2733, 2727];
 
 People
 
 v.
 
 Ramos
 
 (1984) 37 Cal.3d 136, 155-159 [207 Cal.Rptr. 800, 689 P.2d 430].)
 

 We agree with the Attorney General that the foregoing claims have been waived for failure to timely and adequately object at trial.
 
 (People
 
 v.
 
 Crittenden, supra, 9
 
 Cal.4th 83, 146, and cases cited.) As noted by the trial court in reaching a similar conclusion below, defense counsel requested a sidebar conference in the midst of the prosecutor’s remarks on remorse, but did not object on any particular legal ground. Although counsel was not allowed to approach the bench and the prosecutor was asked to resume his argument, nothing in the court’s statements suggested that defense challenges were foreclosed once the prosecutor finished making his point. Again, however, no objection was made. Since no specific claim of misconduct was presented while trial was underway and curative steps could have been taken, the matter has not been preserved on appeal.
 

 No misconduct or constitutional error occurred in any event. “[R]emorse is universally deemed a factor relevant to penalty. The jury, applying its
 
 *855
 
 common sense and life experience, is likely to consider that issue in the exercise of its broad constitutional sentencing discretion no matter what it is told.”
 
 (People
 
 v.
 
 Keenan
 
 (1988) 46 Cal.3d 478, 510 [250 Cal.Rptr. 550, 758 P.2d 1081].) We have rejected misconduct claims based on prosecutorial comments about the unavailability of remorse as a mitigating factor where, as here, the defendant denied guilt as a witness in the capital trial and did not otherwise urge remorse as a basis for mercy. (E.g.,
 
 People v. Holt
 
 (1997) 15 Cal.4th 619, 691 [63 Cal.Rptr.2d 782, 937 P.2d 213] [prosecutor said, “You saw [defendant] testify in the guilt phase of the trial. Simply more lies [and] no remorse”];
 
 People v. Osband
 
 (1996) 13 Cal.4th 622, 724 [55 Cal.Rptr.2d 26, 919 P.2d 640] [prosecutor argued that when defendant “got up here [i.e., testified at the guilt phase] and told you about that crime ... did you get any sense at all that he was sorry for his conduct?”];
 
 People v. Thompson, supra,
 
 45 Cal.3d 86, 123 [prosecutor asked, “what remorse have we heard about from [defendant on the stand]? . . . Not one thing has been said to indicate that [he] has a sign of remorse for what he did”].)
 

 More to the point, the prosecutor merely anticipated predictable defense argument urging sympathy for defendant and sought to negate its mitigating effect by highlighting defendant’s apparent lack of concern for the murder victim. Contrary to what is suggested on appeal, the prosecutor did not mention defendant’s failure to testify or to admit guilt at the penalty phase, and commented only on his testimony at the guilt phase. Nor did the prosecutor suggest that the absence of remorse was an independent factor in aggravation. Indeed, consistent with the trial court’s instructions, the prosecutor explicitly acknowledged that the contrary was true.
 
 [20]
 
 Under the circumstances, no impropriety occurred.
 

 C.
 
 Instruction on Sympathy for Defendant’s Family
 

 In defining the aggravating and mitigating factors to be weighed by the jury in selecting the appropriate penalty, the trial court gave the following instruction: “Although you may consider sympathy for the defendant in determining punishment,
 
 you may not consider sympathy for the defendant’s family, or friends,
 
 and you may not consider sympathy for the victim or his family. In considering sympathy you shall be limited to sympathy for the defendant only and no other person.” (Italics added.)
 

 Defendant contends the italicized language violated the federal Constitution and state law because it prohibited the sentencer from considering, as a mitigating factor, “ ‘ “any aspect of [his] character or record and any of the
 
 *856
 
 circumstances of the offense [offered] as a basis for a sentence less than death.” ’ ”
 
 (Skipper
 
 v.
 
 South Carolina
 
 (1986) 476 U.S. 1, 4 [106 S.Ct. 1669, 1670, 90 L.Ed.2d 1], citing
 
 Eddings v. Oklahoma
 
 (1982) 455 U.S. 104, 110 [102 S.Ct. 869, 874, 71 L.Ed.2d 1] and
 
 Lockett v. Ohio
 
 (1978) 438 U.S. 586, 604 [98 S.Ct. 2954, 2964-2965, 57 L.Ed.2d 973] (plur. opn. of Burger, C. J.); see § 190.3, factor (k);
 
 People v. Easley
 
 (1983) 34 Cal.3d 858, 877-878 & fn. 10 [196 Cal.Rptr. 309, 671 P.2d 813].) Defendant also insists that if the “impact of the murder on the
 
 victim’s
 
 family is relevant to the jury’s decision as to whether or not the death penalty should be imposed”
 
 (Payne v. Tennessee
 
 (1991) 501 U.S. 808, 827 [111 S.Ct. 2597, 2609, 115 L.Ed.2d 720], italics added; see
 
 People v. Edwards
 
 (1991) 54 Cal.3d 787, 832-836 [1 Cal.Rptr.2d 696, 819 P.2d 436]), the jury should not be barred from considering the effect of a death verdict on the
 
 defendant’s
 
 family.
 
 [21]
 

 We have rejected similar claims before, and do so again here. (E.g.,
 
 People
 
 v.
 
 Smithey, supra,
 
 20 Cal.4th 936, 999-1000 [prosecutor did not commit misconduct in urging jury to ignore sympathy for defendant’s family as a mitigating factor];
 
 People v. Ochoa, supra,
 
 19 Cal.4th 353, 454-456 [trial court did not err in refusing to instruct jury to consider sympathy for defendant’s family as a mitigating factor];
 
 People v. Sanders
 
 (1995) 11 Cal.4th 475, 544-546 [46 Cal.Rptr.2d 751, 905 P.2d 420] [trial court did not err in excluding testimony about the grief and stigma a death sentence would inflict upon defendant’s family].) The foregoing cases make clear that while so-called victim impact considerations show the specific harm caused by the defendant and his moral culpability for purposes of determining whether he deserves to die, the impact of a death sentence on the defendant’s family and friends has no similar bearing on the individualized nature of the penalty decision. Sympathy for defendant’s loved ones, as such, and their reaction to a death verdict, as such, do not relate to either the circumstances of the capital crime or the character and background of the accused. Because the challenged instruction was consistent with the foregoing principles, the trial court did not err in giving it at defendant’s trial.
 

 D.
 
 Lack of Instruction on Cosby’s Sentence
 

 Defendant contends the trial court erred in failing to instruct the jury sua sponte as to the sentence received by Cosby in a separate trial based on his participation in the Aztec crime. (See
 
 ante,
 
 fn. 4.) Defendant suggests
 
 *857
 
 he was deprived of any mitigating inferences that could be drawn from such information in violation of his federal constitutional rights to due process, equal protection, and a reliable penalty determination, and in violation of analogous state constitutional guarantees.
 

 The claim is barred at the threshold. Before trial, the prosecutor moved orally and in writing to prevent any reference to Cosby’s sentence at both the guilt and penalty phases. The prosecutor argued that such information was irrelevant and inadmissible under applicable case law, as set forth
 
 post.
 
 At the hearing on the motion, defense counsel conceded that Cosby’s sentence “should be excluded” for the reasons urged by the prosecutor. In other words, defendant now criticizes the trial court for withholding information defendant agreed the jury should not hear, and for presumably relying on such agreement in fashioning its instructions. Under the circumstances, defendant is estopped from complaining about the lack of instruction concerning Cosby’s sentence at the penalty phase. (See
 
 People
 
 v.
 
 Lang
 
 (1989) 49 Cal.3d 991, 1031-1032 [264 Cal.Rptr. 386, 782 P.2d 627] [acknowledging general principle that appellants are foreclosed from challenging errors they induced or circumstances they created during a capital trial].)
 

 In any event, no error occurred. The sentence received by an accomplice is not constitutionally or statutorily relevant as a factor in mitigation. Such information does not bear on the circumstances of the capital crime or on the defendant’s own character and record. “[T]he fact that a different jury under different evidence, found that a different defendant should not be put to death is no more relevant than a finding that such a defendant should be sentenced to death. Such evidence provides nothing more than incomplete, extraneous, and confusing information to a jury, which is then left to speculate [on the matter].”
 
 (People v. Dyer
 
 (1988) 45 Cal.3d 26, 70 [246 Cal.Rptr. 209, 753 P.2d 1], fn. omitted.) For this reason, we have repeatedly rejected the claim that the penalty jury must be instructed in the manner urged by defendant here.
 
 (People
 
 v.
 
 Hines
 
 (1997) 15 Cal.4th 997, 1068 [64 Cal.Rptr.2d 594, 938 P.2d 388];
 
 People
 
 v.
 
 Jackson
 
 (1996) 13 Cal.4th 1164, 1244 [56 Cal.Rptr.2d 49, 920 P.2d 1254];
 
 People v. Rodrigues
 
 (1994) 8 Cal.4th 1060, 1188 [36 Cal.Rptr.2d 235, 885 P.2d 1];
 
 People v. DeSantis
 
 (1992) 2 Cal.4th 1198, 1251 [9 Cal.Rptr.2d 628, 831 P.2d 1210];
 
 People
 
 v.
 
 Morris
 
 (1991) 53 Cal.3d 152, 225 [279 Cal.Rptr. 720, 807 P.2d 949];
 
 People
 
 v.
 
 Johnson
 
 (1989) 47 Cal.3d 1194, 1249 [255 Cal.Rptr. 569, 767 P.2d 1047];
 
 People
 
 v.
 
 Malone, supra,
 
 47 Cal.3d 1, 53-54.)
 

 Defendant suggests this line of authority must be reconsidered in light of
 
 Parker v. Dugger
 
 (1991) 498 U.S. 308 [111 S.Ct. 731, 112 L.Ed.2d 812]. Not so. As we have explained in prior cases,
 
 Parker
 
 did not hold that
 
 *858
 
 information about an accomplice’s sentence must be introduced in mitigation, or that a comparison of sentences meted out for the capital crime is necessary. “The
 
 Parker
 
 court merely concluded a Florida trial judge, in sentencing the defendant to death, had in fact considered the nonstatutory mitigating evidence of the accomplice’s sentence, as under Florida law he was entitled to do. (Parker,
 
 supra,
 
 498 U.S. at pp. 314-315 [112 L.Ed.2d at pp. 821-823].)
 
 Parker
 
 does not state or imply the Florida rule is constitutionally required, and California law is to the contrary.”
 
 (People
 
 v.
 
 Cain, supra,
 
 10 Cal.4th 1, 63; accord,
 
 People v. Rodrigues, supra,
 
 8 Cal.4th 1060, 1188-1189;
 
 People v. Mincey
 
 (1992) 2 Cal.4th 408, 479-480 [6 Cal.Rptr.2d 822, 827 P.2d 388].)
 

 E.
 
 Miscellaneous Claims
 

 Towards the end of his opening brief, defendant makes a shotgun attack on the validity of the death judgment and the constitutionality of the statutory scheme under which it was obtained. All such claims have failed in this court many times before. We decline to reconsider past decisions, and reject each claim again here in summary fashion. Contrary to defendant’s arguments:
 

 1. The death penalty law does not delegate to the prosecutor, through his charging discretion, judicial power to decide which defendants will be sentenced to death, in violation of federal due process guarantees or state separation of powers principles.
 
 (People v. Crittenden, supra, 9
 
 Cal.4th 83, 152, and cases cited.)
 

 2. Prosecutorial discretion to select those eligible cases in which the death penalty will actually be sought does not render the death penalty law arbitrary and capricious or otherwise offend cruel and unusual punishment principles under the federal Constitution.
 
 (People v. Keenan, supra,
 
 46 Cal.3d 478, 505, and cases cited.)
 

 3. The statutory preference for a unitary capital jury, as reflected in the denial of a pretrial motion for separate guilt and penalty juries here, does not violate the right to due process and an impartial jury under the federal and state Constitutions, or the right to a reliable death judgment under the federal Constitution.
 
 (People
 
 v.
 
 Pride
 
 (1992) 3 Cal.4th 195, 252-253 [10 Cal.Rptr.2d 636, 833 P.2d 643], and cases cited.)
 

 4. The special circumstances set forth in the death penalty statute sufficiently narrow the class of murderers eligible for the death penalty, and satisfy the federal proscription against cruel and unusual punishment.
 
 *859
 

 (People
 
 v.
 
 Arias
 
 (1996) 13 Cal.4th 92, 186-187 [51 Cal.Rptr.2d 770, 913 P.2d 980], and cases cited.)
 

 5. Standard instructions defining reasonable doubt and related concepts do not dilute the prosecution’s burden of proof in violation of due process or otherwise offend the federal Constitution.
 
 (People
 
 v.
 
 Ray
 
 (1996) 13 Cal.4th 313, 346-348 [52 Cal.Rptr.2d 296, 914 P.2d 846], and cases cited.)
 

 6. Standard instructions defining the “circumstances of the crime” as an aggravating factor are not impermissibly vague and do not fail to guide the jury’s sentencing discretion under the Eighth Amendment of the federal Constitution.
 
 (Tuilaepa v. California
 
 (1994) 512 U.S. 967, 975-980 [114 S.Ct. 2630, 2636-2639, 129 L.Ed.2d 750], affg.
 
 People
 
 v.
 
 Tuilaepa, supra,
 
 4 Cal.4th 569, 594-595.)
 

 7. The death penalty law is not defective insofar as it fails to require (1) written findings as to the aggravating factors supporting a death judgment, (2) proof beyond a reasonable doubt of any such aggravating factors, (3) jury unanimity on the dispositive aggravating factors, (4) a finding that aggravating factors outweigh mitigating factors beyond a reasonable doubt, and (5) a finding beyond a reasonable doubt that death is the appropriate penalty.
 
 (People
 
 v.
 
 Rodriguez, supra,
 
 42 Cal.3d 730, 777-779.)
 

 8. Due to the individual and normative nature of the jury’s sentencing determination, no instruction concerning the burden of proof or burden of persuasion as to the appropriate penalty is required.
 
 (People
 
 v.
 
 Hayes
 
 (1990) 52 Cal.3d 577, 643 [276 Cal.Rptr. 874, 802 P.2d 376].)
 

 VI. Conclusion
 

 The judgment is affirmed in its entirety.
 

 George, C. J., Mosk, J., Kennard, J., Werdegar, J., Chin, J., and Brown, J., concurred.
 

 Appellant’s petition for a rehearing was denied June 21, 2000.
 

 [1]
 

 All further statutory references are to the Penal Code unless otherwise stated.
 

 [2]
 

 Cardwell remembered the maroon Buick because he rebuilt General Motors cars as a hobby, and had previously owned the same model—an Electra 225, otherwise known as a “deuce and a quarter.” Cardwell testified that the Electra parked near the liquor store had thin whitewall tires and looked “tacky” because several parts were missing, including hubcaps, a front license plate, chrome molding along one side, and rear wheel skirts. Both before and during trial, Cardwell identified the maroon Buick Electra 225 owned and used by defendant in August 1985 as the same car he (Cardwell) had seen near the crime scene.
 

 [3]
 

 Dr. Bucklin described pain as a subjective phenomenon that can only be quantified by the affected person. Nevertheless, he testified that “nerve fibers which carry impulses of pain
 
 *820
 
 directly to the brain” are located “in the skin and in the tissue right below the skin.” According to Dr. Bucklin, any penetration of the skin with a knife, including each of the shallow cuts on Muck’s flank, would produce a pain impulse.
 

 [4]
 

 Cosby and Bemore were jointly charged in both municipal and superior court with the special circumstance murder of Muck. Represented by separate trial counsel, both defendants joined together in making certain pretrial motions. However, the superior court ultimately granted a defense motion for severance as to trial. As a result, Cosby was not tried by the same jury that convicted and sentenced Bemore for the robbery and murder of Muck, nor is Cosby a party to this automatic appeal. Shortly before the guilt phase began, the prosecution and defense agreed that no reference would be made during Bemore’s trial to any conviction or sentence received by Cosby for participating in the Aztec crime. Guilt phase instructions told Bemore’s jury not to “discuss" or “give any consideration to why Keith Cosby is not being prosecuted in this trial or whether he has been or will be prosecuted.”
 

 [5]
 

 Robertson testified that he received immunity from prosecution as an accessory after the fact to the Aztec crime. Patterson testified that, at the time of trial in the present case, he was serving a prison term for an unrelated crime. He denied that any “deal” had been made with the district attorney in exchange for his testimony in defendant’s case.
 

 [6]
 

 Patterson testified that a few minutes after they dumped the safe, he and defendant were stopped for a traffic violation in downtown San Diego. Police Officer Joanna Silva confirmed at trial that she stopped defendant’s car for speeding at 1:00 o’clock in the morning on September 11, 1985. Silva vividly remembered the incident because defendant—the driver of the vehicle—startled her by “bursting out of the car and putting his hands up.” Ironically, Silva was one of two officers who first arrived at the liquor store on August 26, shortly after the instant robbery murder occurred. However, Officer Silva testified that she had no reason to believe defendant was involved in the Aztec crime when she encountered him during the traffic stop two weeks later.
 

 [7]
 

 For example, Robertson described his cousin, Cosby, as no more than five feet six inches tall. No evidence established that Cosby wore size eight shoes, the approximate size of the
 
 *824
 
 smaller shoe prints found at the crime scene some distance from Muck’s body. However, Robertson’s testimony that Cosby did not have “big feet,” and that his feet were “in proportion” to his relatively small stature, suggested that Cosby could not have made the size 13 shoe prints left near the body by the killer.
 

 [8]
 

 Wadley also testified that she saw defendant on Bates Street around 8:00 p.m. on August 26, about two hours
 
 before
 
 the capital crime. At that time, defendant was wearing black and red tennis shoes evidently similar to the size 13 Pumas he had received from Patterson. According to Wadley, defendant was not wearing the same shoes when she saw him the next morning. Also, while discussing the capital crime on the latter occasion, defendant purportedly expressed concern over “blood and footprints.”
 

 [9]
 

 The first two incidents occurred while defendant was “captain” or trusty of the “tank” in which about 18 inmates were housed, and was charged with helping deputies maintain order. First, defendant threatened to kill Heflin for talking too long on the telephone, saying, “you ain’t the first fucking person that Fve killed.” Second, while the two men discussed their criminal exploits, defendant said he had “killed somebody in one of his robberies,” and that “the stupid son-of-a-bitch should have opened the safe.” The third incident occurred after Heflin was moved to another jail facility because he had agreed to testify against a friend of
 
 *825
 
 defendant’s. Defendant happened to see Heflin in a holding cell inside the courthouse, threw him against the wall, and threatened to “tear off [his] head” if he “ratted” on defendant.
 

 In an apparent attempt to undermine Heflin’s credibility, defense counsel asked on cross-examination whether defendant, as tank captain, had confronted Heflin over the presence of illicit drugs in his cell. Heflin denied the charge. Heflin also described an incident in which defendant got “mad” and “jumped” one inmate who did not share his drugs with another inmate who was a friend of defendant’s. Heflin testified that he tried to intervene in the dispute, but that defendant told him to “shut up" and “threw [him] in the comer.” Unlike events disclosed on direct examination of Heflin, the latter incident did not directly bear on defendant’s guilt because he made no admissions concerning the capital crime. However, as explained later in the opinion, all threatening and assaultive acts committed by defendant in jail and introduced at the guilt phase provide context for assessing certain tactical decisions made by defense counsel at the
 
 penalty
 
 phase.
 

 [10]
 

 Defendant testified that he and Heflin were housed in the protective custody unit reserved for inmates who could not safely be placed in the mainstream population. Defendant purportedly became drug free after his arrest, and used his position as captain to ensure no drugs were used. However, aside from confronting Heflin once over drugs in his cell, defendant denied ever threatening or physically assaulting Heflin. The defense called another
 
 *827
 
 inmate, Gary Kruse, who claimed he saw no “physical conflict” between defendant and Heflin. Kruse also testified that he never heard defendant discuss the capital crime in jail.
 

 [11]
 

 Another eyewitness to the Wherehouse crime, customer Carrie Jacobs, was unavailable to testify in person at the capital trial. Hence, the defense read into evidence her prior testimony from the same preliminary hearing in which Salvatierra had also appeared as a witness. On the one hand, Jacobs identified defendant as the person who robbed Salvatierra. On the other hand, Jacobs described the robber as no more than six feet, one inch tall. Both Jacobs and Salvatierra described the Wherehouse robber as “muscular.” However, defendant testified that he was “skinny" as the result of drug abuse and weighed only 175 pounds when the Aztec and Wherehouse crimes occurred.
 

 [12]
 

 During one of their mother’s extended hospital stays, defendant and his youngest half brother, Kenneth, were cared for by a family friend, Matilda George. Kenneth testified that Matilda was “normal” on some occasions and “cruel” on others. She reportedly locked up food and the television set, and beat the boys with a cane or extension cord when they did not properly perform household chores. Defendant’s oldest half brother, Ray, testified that he once shared heroin with Matilda.
 

 [13]
 

 Inmates testifying against defendant admitted that they had never seen defendant use drags or engage in sexual activity in jail.
 

 [14]
 

 On June 5, 1990, California voters approved Proposition 115, the Crime Victims Justice Reform Act which, among other things, made various changes in the statutory scheme governing voir dire in criminal cases. (E.g.,
 
 People
 
 v.
 
 Waidla
 
 (2000) 22 Cal.4th 690, 713-714
 
 [94
 
 Cal.Rptr.2d 396, 996 P.2d 46] [describing effect of Code Civ. Proc., § 223, as revised by Prop. 115, on Hovey’s requirement of individualized, sequestered voir dire in capital cases]; see
 
 Tapia
 
 v.
 
 Superior Court
 
 (1991) 53 Cal.3d 282, 299-300 [279 Cal.Rptr. 592, 807 P.2d 434];
 
 *835
 

 Raven
 
 v.
 
 Deukmejian
 
 (1990) 52 Cal.3d 336, 344 [276 Cal.Rptr. 326, 801 P.2d 1077].) Defendant’s trial took place in 1989, before Proposition 115 was adopted.
 

 [15]
 

 Defense counsel did not question four people selected as jurors (Augustine A., Kenneth A., Carl C., and Clayton C.), and two people originally chosen as alternate jurors (Elizabeth D. and James H.). Alternate Elizabeth D. replaced an actual juror during trial, bringing to five the total number of persons who voted as jurors and were not questioned by the defense during
 
 Hovey
 
 voir dire.
 

 [16]
 

 Defendant moved pursuant to section 995 to dismiss the torture-murder special-circumstance allegation before trial. The trial court denied the request after considering the parties’ oral and written arguments on the matter.
 

 [17]
 

 After defendant’s trial, Proposition 115 amended section 190.2(a)(18) by deleting the second sentence referring to “extreme physical pain.” This amendment does not apply to crimes committed before Proposition 115 was passed.
 
 (People v. Crittenden, supra,
 
 9 Cal.4th 83, 140, fn. 14.)
 

 [18]
 

 The version of CALJIC No. 8.81.18 used in this case states, “To find that the special circumstance, referred to in these instructions as murder involving infliction of torture, is true, each of the following facts must be proved: [¶] 1. The defendant intended to kill Mr. Muck, [¶] 2. The defendant intended to inflict extreme cruel physical pain and suffering upon Mr. Muck for the purpose of revenge, extortion, persuasion or for any sadistic purpose, and 3.
 
 *840
 
 The defendant did in fact inflict extreme cruel physical pain and suffering upon Mr. Muck no matter how long its duration. [¶] Awareness of pain by the deceased is not a necessary element of torture.”
 

 [19]
 

 In defending against a finding of waiver at the hearing, McKechnie and Barranco explained that when the trial court denied a sidebar conference and urged completion of the prosecutor’s statements about remorse, they assumed the court had “tacitly overruled” any misconduct claim they might raise, and that further argument on the issue would have been
 
 *854
 
 futile and merely highlighted such statements for the jury. The court rejected this view of the facts. It found counsel could not reasonably have believed that a ruling on prosecutorial misconduct had been made or that an objection on such grounds would not be entertained. The court explained, “I need to hear the question before I can rule on any objection. . . . The court needed to hear exactly what statement [the prosecutor] was going to make before I could make any intelligent ruling. [¶] Nothing more was forthcoming [from the defense] after [the prosecutor] completed his statement .... I don’t think there was any reasonable interpretation of my remark that I was foreclosing any further discussion on the matter." A few moments later, the court told counsel that “had you pursued the matter, we could have discussed it. I’m satisfied in my mind that an instruction, an admonition or some combination thereof would have and could have been forthcoming that would have completely dealt with the matter.” Finally, the court confirmed that “no objection was ever voiced here. [When] there was a request to approach the bench I obviously assumed there was going to be some objection forthcoming, but we never got there, so I didn’t know exactly what the objection was. . . .[¶]. . - . .Frankly, I don’t think it was reasonable for the defense to take the position that the court had ... a closed mind on the matter, [that] the court had made some ruling. All I asked was let me hear what [the prosecutor] has to say before I know what the problem is and know what the issues are.”
 

 [20]
 

 The jury was told that the “absence of a statutory mitigating factor does not constitute an aggravating factor” at the penalty phase.
 

 [21]
 

 Defendant’s trial occurred before
 
 Payne v. Tennessee, supra,
 
 501 U.S. 808, was decided. Prior to
 
 Payne,
 
 evidence concerning the impact of the crime on the victim’s family could not be considered by the sentencer in a capital case.
 
 (Booth v. Maryland
 
 (1987) 482 U.S. 496, 501-502 [107 S.Ct. 2529, 2532-2533, 96 L.Ed.2d 440].) As noted above in the text, defendant’s jury received instructional language which, consistent with
 
 Booth,
 
 prohibited consideration of “sympathy for the victim or his family.”