Filed 1/14/25  P. v. Jenks CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G063476 |
| v. | (Super. Ct. No. FVI18001808) |
| HOWARD JENKS, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of San Bernardino County, Shannon Faherty, Judge. Affirmed and remanded with instructions.

Theresa Osterman Stevenson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Christopher P. Beesley and Kristen Kinnaird Chenelia, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

A jury found defendant Howard Jenks guilty of breaking into the victim V.E.'s home and sexually assaulting her over the course of about three hours. This resulted in guilty verdicts on, among other things, six counts of sexual assault—three each of rape and forced oral copulation. At sentencing, the court sentenced him consecutively on each of those counts, resulting in a total sentence exceeding 150 years to life.

On appeal, Jenks first contends the court abused its discretion in running the counts consecutively. The court based its ruling on the fact that Jenks had many opportunities to stop and consider what he was doing but decided to press on with the assault. We find no abuse of discretion in that ruling and thus affirm the vast bulk of the sentence.

However, we agree that a two year determinate sentence for criminal threats should have been stayed because the threats were part of a single course of conduct to accomplish the sexual assaults.

Next, Jenks contends there was insufficient evidence to find beyond a reasonable doubt that Jenks used a knife, which the prosecution relied on to support an enhancement for use of a deadly weapon. However, the victim specifically testified to feeling a blade against her neck and hearing a clunk that sounded like a knife being put down, and the police ultimately found a knife in Jenks's possession when he was arrested. Moreover, corroborating her trial testimony, V.E. told a nurse the evening of the assault that her assailant had used a knife. Crediting the victim's testimony, as we must, the jury could find beyond a reasonable doubt that Jenks used a knife.

Jenks also contends there was insufficient evidence of great bodily injury. However, the lacerations and bruising found on various parts of the victim's body supported the jury's finding.

Finally, Jenks contends the prosecutor committed error when he commented on defendant's testimony, stating, "Apparently, a complete set of flat-out lies is no problem for the defense attorney." The trial court recognized that this comment was inappropriate, as do we. However, we agree with the trial court that, in the grand scheme of the trial, this single comment was not prejudicial. Accordingly, we affirm.

FACTS

On June 28, 2018, V.E., aged 69, was living in a triple wide mobile home in the city of Hesperia, San Bernardino County, with her adult son Chris. Around 10 p.m., V.E. said goodnight to Chris, locked the doors, and turned off the air conditioning before going to sleep in her bedroom. Chris was in the family room. He was getting ready to go pick up his friend James, who was at a party about a block away and needed a ride home. Chris drove to the location of the party and was sitting in his car waiting for James to come out when he saw Jenks and someone named "Bear" drive up in Jenks's car and go inside. They appeared drunk.

Chris had met Jenks about two years before, though they were not friends. In fact, Chris had confronted Jenks about making sexual advances on Chris's girlfriend. Jenks denied it, though Chris did not believe Jenks. Oddly, that confrontation ended with Chris providing Jenks with drugs. Chris would later be convicted of manufacturing drugs, and at the time of the incident in this case, he was on felony probation.

On the night of the rape, after Jenks went into the house where the party was being held, James emerged and Chris drove him home, which was about 10 minutes away. When Chris returned to his own home, V.E. was already in bed. Chris remained in the den and living room until going to sleep in the den around midnight.

3

At 1:30 a.m., V.E. awoke to Jenks holding a knife against her neck, telling her to be quiet and not to say anything or he would slit her throat. Jenks said Chris was selling drugs to little kids and owed him $30,000. The debt had to be paid, and he was going to either rape her or kill Chris and asked which one she wanted.

Jenks got on top of V.E. and started to pull her down off the bed. When her feet touched the ground, she ran for the door and started to scream, but Jenks hit her with a closed fist, splitting open the side of her head. Stunned, she turned, and he hit her across the ear, splitting open her ear. V.E. heard her nightgown rip. She did not see a knife but heard Jenks place something metal which she believed to be a knife on her nightstand. Jenks threw V.E. back on the bed, spread her legs and started having sex with her. Jenks inserted his penis in her vagina and thrusted eight or ten times before losing his erection. He then put his penis in her mouth and told her to suck on it. V.E. complied because she was scared for herself and her son.

Jenks began to lose his erection and pushed V.E. back on the bed, climbed on top of her and inserted his penis into her vagina a second time. Again, he began to lose his erection, and pulled V.E. by the legs towards the end of the bed and inserted his penis into her vagina a third time and thrusted about 12 times. Jenks made V.E. get down on her knees and he shoved his penis into her mouth. His penis became erect, and he pushed V.E. back on the bed, got on top of her, and tried to insert his penis but was unsuccessful.

Jenks told V.E. to get lubricant. She explained that she had nothing like that because her husband had been dead for a long time. He dragged her into the bathroom and told her to get something. V.E. was shaking so much that

4

Jenks hollered at her to stop shaking. V.E. grabbed what she believed to be hand lotion. Jenks dragged her back to the bedroom and put the lotion on her vagina. He inserted his penis into her vagina and began having sex with her. Jenks stopped and asked V.E. what she had grabbed because it was making him sore. V.E. did not know. She later determined it was a grainy foot lotion. When she told Jenks she did not know what it was, he dragged her back into the bathroom to get something else. V.E. searched the bathroom drawers, found lotion, and gave it to him. Jenks told V.E. to get on the bathroom counter and he spread her legs and inserted his penis into her vagina. He dragged her back to the bedroom and made her get on her knees and suck his penis. Jenks had V.E. get back on the bed, he applied lotion to her vagina and had sex with her.

Jenks told V.E. that if she could make him "cum," this would all be over with. Toward the end of the incident, Jenks performed oral sex on V.E. without her permission. In the end, Jenks pulled up his pants, looked around, grabbed a hat, and told V.E. to remain on her bed until he had enough time to leave. The entire incident from start to finish lasted about three hours.

In total, Jenks had sex with V.E. ten times, eight times on the bed and twice in the bathroom. On each occasion, after Jenks inserted his penis into her vagina, it became flaccid, rendering the sexual intercourse brief. Twice Jenks was incapable of getting fully erect and could not insert his penis. To the best of her recollection, V.E. recalled she was forced to orally copulate Jenks four times. He also choked her twice.

At one point, Jenks asked V.E. if she liked Katy and the baby. The baby was her grandson (Chris's son), and Katy was his mother. Jenks threatened to kill the baby if V.E. reported him to the police.

As soon as Jenks left, V.E. grabbed a robe and ran to the family room at the other end of the house and woke up Chris. V.E. was bleeding. She told Chris she had been raped for the last three hours.

Chris ran outside to look for the perpetrator, but he did not see anyone in the dark. Chris called 9-1-1. They did not know who the perpetrator was at the time. V.E. said that she might have seen him at the house before.

An officer showed V.E. a six pack photographic lineup. She narrowed it down to Jenks and one other person, and ultimately picked the other person. James came over later that morning and based on what he said, Chris looked Jenks up on Facebook. Chris showed V.E. a picture of Jenks, and she replied, "a thousand times, that's him."

Officers found a jar of Avon Foot Works scrub with Jenks's fingerprint on it and bloodstains on V.E.'s bed. On the floor was a pair of women's underwear that appeared to be cut on the sides.

V.E. was taken to the hospital where she received stitches for a 2.5 cm laceration to her left eyebrow and adhesive for a 2.5 cm laceration to her left ear.

A forensic nurse performed a sexual assault examination of V.E. The nurse described V.E. as cooperative and intermittently tearful. V.E. said she had pain to her genitals. She did not believe Jenks ejaculated because he was frustrated that he could not "cum." V.E. had bruises all over her body, including her face, ear, neck, arms, back, lower legs, and thighs. The bruising on the back of her arms was consistent with being grabbed, and bruising to her jaw/neckline was consistent with strangulation. V.E. had multiple tears and lacerations to her vaginal opening. Because she was postmenopausal she was no longer producing estrogen and her genitalia was less elastic and more

6

likely to tear. V.E. had had a hysterectomy removing her cervix, meaning it would be less likely to recover DNA.

Consistent with V.E.'s testimony that Jenks never ejaculated, swabs from V.E.'s rape kit showed no sperm. The vaginal, vestibule and vulva swabs had male DNA, but it was overpowered by female DNA and insufficient to effectively determine a male profile. However, the mons pubis and perioral (area around the mouth) swabs had both V.E.'s and, to a very high degree of certainty, Jenks's DNA.

Jenks lived in a trailer about eight to ten miles from V.E. When officers arrived, there was a pair of black jeans on the floor in the doorway. Clipped to the inside of the left front pocket was a folding knife with a three to four inch blade. Officers arrested Jenks at his residence.

Afterward, Jenks was physically examined. He said he had not had intercourse in a week. A nurse took swabs of his mouth and genitals, and a sample of his pubic hair and fingernail scrapings. The result was that V.E.'s DNA was found on Jenks's penile swab and hand swabs.

Jenks testified in his defense and explained that he did air conditioning and heating for a living. Jenks met Chris through Jenks's then-girlfriend Christy and her friend Katy. Chris was having issues with refrigeration lines on the side of his house and Jenks helped him out. That was how Jenks met V.E.

Jenks did not deny having sex with V.E. On the day in question, Jenks testified, he went to V.E.'s house to see if she needed any jobs done in hopes of making money. He knocked on the door, and V.E. invited him in. He asked about the air-conditioning and made a "flirty pass" towards her. That progressed to him offering to perform sexual acts. They went to the bedroom. First, he rubbed her feet with foot scrub, and then he gave her oral sex. V.E.

7

was worried her son would come home and catch them. He asked V.E. if she was able to pay him, and she said no. He lost his temper, called her a "fucking bitch," punched her twice, and left. Jenks said he arrived around 9:00 p.m. and left 45 minutes later.

## STATEMENT OF THE CASE

On June 6, 2023, a San Bernardino County jury found Jenks guilty of first degree burglary with person present (count 1; Pen. Code, § 459)[1], three counts of forcible rape (counts 2, 3, 4; § 261, subd. (a)(2)), three counts of forcible oral copulation (counts 5, 6, 7; § 287, subd. (c)(2)(A)), criminal threats (count 8; § 422, subd. (a)) and dissuading a witness from reporting a crime (count 9; § 136.1, subd. (b)(1)). The jury further found Jenks committed the forcible rapes and forcible oral copulation in the commission of a burglary (§ 667.61, subds. (a), (d)) and personally used a dangerous and deadly weapon (§ 12022, subd. (b)(1)). The jury also found as to count 2 (forcible rape) that Jenks personally inflicted great bodily injury (§ 12022.7, subd. (a)). The jury was unable to make a finding on great bodily injury allegations on the remaining forcible rape and forcible oral copulation charges (counts 3-7), and the allegations were ultimately dismissed.

On September 14, 2023, the trial court sentenced Jenks to a total term of 154 years to life in prison. The court imposed two years for criminal threats (count 8), two years for dissuading a witness (count 9), and stayed the sentence for burglary (count 1). For each count of forcible rape and forcible oral copulation the court imposed consecutive terms of 25 years to life (counts 2-7). Jenks appealed.

---

[1] All statutory references are to the Penal Code.

8

DISCUSSION

I.

THE COURT DID NOT ERR IN RUNNING THE SENTENCES CONSECUTIVELY

The principal issue in this appeal is whether the court abused its discretion in running Jenks's sentences consecutively. The issue is consequential: had the court run the sentences concurrently, Jenks would have received a combined sentence of 29 years to life. Being aged 46, this would allow the possibility that Jenks could be released during his lifetime. As it stands, he will live out the remainder of his years in prison.

Penal Code section 667.61 specifically addresses the issue of concurrent versus consecutive sentences in the context of certain sex crimes, including the charges here, and it provides a framework for imposing consecutive sentences under two circumstances. The first is mandatory: if the "crimes involve separate victims or involve the same victim on separate occasions," then "a full, separate, and consecutive term *shall* be imposed" for each crime. (§ 667.6, subd. (d)(1), italics added.) "A finding under section 667.6(d) that the crimes involved separate victims or occurred on separate occasions eliminates the court's discretion." (*People v. Catarino* (2023) 14 Cal.5th 748, 753 (*Catarino*).) The second circumstance is permissive: if the offenses "involve the same victim on the same occasion," then "a full, separate, and consecutive term *may* be imposed" for each crime. (§ 667.6, subd. (c), italics added.)

Critical to this analysis is an understanding of how this statute uses the term "occasion," which takes on a technical meaning under the statute. Subdivision (d)(2) provides: "In determining whether crimes against a single victim were committed on separate occasions under this subdivision, the court shall consider whether, between the commission of one sex crime

9

and another, the defendant had a reasonable opportunity to reflect upon the defendant's actions and nevertheless resumed sexually assaultive behavior. Neither the duration of time between crimes, nor whether or not the defendant lost or abandoned the opportunity to attack, shall be, in and of itself, determinative on the issue of whether the crimes in question occurred on separate occasions." "Under the broad standard established by Penal Code section 667.6, subdivision (d), the Courts of Appeal have not required a break of any specific duration or any change in physical location." (*People v. Jones* (2001) 25 Cal.4th 98, 104.)

"The predicate finding that enables such sentencing under section 667.6(d) is made by 'the sentencing judge.'" (*Catarino, supra,* 14 Cal.5th at p. 754.)[2] The court makes that determination by a preponderance of the evidence. (*People v. Groves* (2003) 107 Cal.App.4th 1227, 1230.) "Once a trial judge has found under section 667.6, subdivision (d), that a defendant committed offenses on separate occasions, we may reverse only if no reasonable trier of fact could have decided the defendant had a reasonable opportunity for reflection after completing an offense before resuming his assaultive behavior." (*People v. Garza* (2003) 107 Cal.App.4th 1081, 1092.)

In selecting consecutive terms here, the court based its ruling on both the mandatory and permissive prongs of section 667.6. The court stated, "The test in this situation being whether there are acts and an opportunity for reflection. Having heard the facts this this case, I think that there were numerous times that there were chances to stop and reflect. There were

---

[2] In *Catarino*, our high court held that this factual finding, which results in consecutive sentences, does not violate *Apprendi v. New Jersey* (2000) 530 U.S. 466, notwithstanding that the factual finding is made by the judge instead of being made by the jury beyond a reasonable doubt.

times where positions were changed, that the acts were changed, going into the bathroom, coming out. There are a number of situations and acts that could be considered separate in this. [¶] I'm also going to acknowledge that I do have the discretion to impose concurrent terms, but I am going to decline to do that based on the facts in this case."

We conclude the court's ruling is sound on both prongs.

With regard to the mandatory prong, a reasonable fact finder could conclude Jenks had an opportunity for reflection between the crimes. The entire episode lasted three hours, which provided ample time for defendant to reflect on his actions. V.E. testified that Jenks was continually losing his erection and that the actual acts of rape generally did not last long as a result. These instances all provided reasonable opportunities for defendant to reflect on his actions and stop his assaultive behavior. The assaults occurred in different locations, such as the bathroom and different parts of the bedroom, which afforded defendant numerous opportunities to reflect on his actions. Bearing in mind the technical definition of "occasion," a reasonable fact finder could conclude each charged sexual assault occurred on a different occasion, and thus a consecutive sentence was mandatory.

In this regard, the present case is similar to *People v. Garza* (2003) 107 Cal.App.4th 1081, where the defendant drove the victim to a remote location and forced her to orally copulate him. He then forced her at gunpoint to undress. He then digitally penetrated her. Afterwards, he fondled her breast. Then he raped her. Even the short intervals between the oral copulation, the digital penetration, and the rape were deemed sufficient to support the trial court's ruling that consecutive sentences were mandatory. (*Id.* at p. 1092-1093.) Here, the various sex acts took place over a longer

11

period of time, and Jenks's consistent failure to keep an erection provided an even more stark opportunity to reflect on his actions and cease the assault.

But even if the consecutive sentences were not mandatory, the court acted well within its discretion in selecting consecutive sentences. The crimes at issue here were particularly heinous, as they involved a home invasion, a vulnerable victim, a deadly weapon, physical violence, and threats against the victim's loved ones. The fact that defendant lost his erection multiple times, and thus had a natural opportunity to end the assault, but pressed on regardless, shows a high degree of callousness. This was a nightmare scenario for V.E. The circumstances of the case certainly warranted consecutive sentences, and there is nothing in this record to suggest the court abused its discretion in so concluding.

II.

THE PUNISHMENT FOR CRIMINAL THREATS SHOULD HAVE BEEN STAYED

The count for criminal threats was based on Jenks's threats to V.E. when he first woke her up in her bedroom, saying he would slit her throat and/or kill her son if she did not cooperate. Jenks contends that because these threats were incidental to the sexual assault, the 2 year determinate punishment should have been stayed under section 654. The trial court never addressed whether section 654 applies. We agree with Jenks that the 2 year sentence should have been stayed.

Section 654 provides: "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision." The purpose of the statute "'is to ensure that a defendant's punishment is commensurate with his culpability and that he is

12

not punished more than once for what is essentially one criminal act.'" (*People v. Kwok* (1998) 63 Cal.App.4th 1236, 1252.)

"Section 654 precludes multiple punishment for a single act or omission, *or an indivisible course of conduct*." (*People v. Deloza* (1998) 18 Cal.4th 585, 591 (italics added).) "Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." (*Neal v. State* (1960) 55 Cal.2d 11, 19, disapproved on other grounds by *People v. Correa* (2012) 54 Cal.4th 331, 334.)

On appeal, we review any factual findings by the court for substantial evidence, but we decide *de novo* whether section 654 applies. (*People v. Valli* (2010) 187 Cal.App.4th 786, 794.)

The People argue that the court's implied sentencing choice should be upheld because the threat had a different criminal intent than the sexual assault: to instill fear as opposed to satisfy Jenks's sexual desires. However, there is nothing in the evidence to suggest that Jenks had any independent desire to instill fear; rather, the fear was to facilitate the sexual assault. As the prosecutor argued in closing, "[W]hat was [Jenks's] motive for making these threats? Obviously, it was to get her to submit to the rapes."

"Where the commission of one offense is merely "'a means toward the objective of the commission of the other,'" section 654 prohibits separate punishments for the two offenses." (*People v. Wynn* (2010) 184 Cal.App.4th 1210, 1215.) That is precisely the case here. Accordingly, the 2 year sentence for criminal threats should have been stayed.

13

## III.

Next, Jenks contends there was insufficient evidence that he used a deadly weapon (a knife) in the commission of the crimes. The gist of Jenks's argument is that V.E. never actually saw the knife, and she was under a lot of stress that night, so her testimony that she felt a knife against her neck and that she heard the knife being put down on the dresser should be discounted, and the fact that Jenks was ultimately found with a pocket knife on him was just a coincidence.

That sounds like a viable argument to make to a jury. However, "In evaluating a claim regarding the sufficiency of the evidence, we review the record 'in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.'" (*People v. Westerfield* (2019) 6 Cal.5th 632, 713.) Maybe the stress of that night clouded V.E.'s memory, or maybe it seared the events of that night into her memory in sharp detail. That was for a jury to contemplate, not us. There was testimony that Jenks used a knife, and the fact that he was found with a knife corroborates the testimony. Moreover, a fact that neither party seems to have noted is that V.E. reported to the nurse who treated her *later that night* that her assailant had held a knife to her neck. That fact undercuts Jenks's argument that V.E.'s memory could not be trusted. The evidence at trial easily satisfied the substantial evidence standard.

14

IV.

SUBSTANTIAL EVIDENCE SUPPORTS GREAT BODILY INJURY

Next, Jenks contends there was insufficient evidence of great bodily injury, which the jury found in connection with only one of the counts of rape (count 2). We conclude substantial evidence supports the enhancement.

"Any person who personally inflicts great bodily injury on any person other than an accomplice in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for three years." (§ 12022.7, subd. (a).) "As used in this section, 'great bodily injury' means a significant or substantial physical injury." (§ 12022.7, subd. (f).)

"[D]etermining whether a victim has suffered physical harm amounting to great bodily injury is not a question of law for the court but a factual inquiry to be resolved by the jury. [Citations.] "'A fine line can divide an injury from being significant or substantial from an injury that does not quite meet the description.'" [Citations.] Where to draw that line is for the jury to decide." (*People v. Cross* (2008) 45 Cal.4th 58, 64.)

The evidence from trial showed that V.E. suffered two lacerations, one to her left eyebrow, and another on her ear, each of which were 2.5 centimeters long. The eyebrow laceration was closed with stitches, and the ear laceration was closed using an adhesive. Additionally, according to the nurse who treated her that night, "She had lots of bruises all over her body, actually, on her face and on her neck. She had multiple bruises on her arms, on her back, the upper part of her back, on her lower legs, and then she had bruising in the perineal area or the upper part of the thighs, and on her lower legs also." She also suffered multiple lacerations to her vagina.

15

The injuries V.E. suffered are consistent with injuries held to be sufficiently great in past cases. (*See People v. Lopez* (2018) 5 Cal.5th 339, 357 [laceration and severe bruising were sufficient evidence of great bodily injury]; *People v. Escobar* (1992) 3 Cal.4th 740, 750 [bruising, abrasions, and soreness constituted sufficient evidence of great bodily injury]; *People v. Medellin* (2020) 45 Cal.App.5th 519, 529 [laceration requiring three stitches that hurt for a few days, left a small scar, and loosened false tooth sufficient for GBI]; *People v. Sanchez* (1982) 131 Cal.App.3d 718, 733-734 [multiple contusions, lacerations, and abrasions constituted great bodily injury]; *People v. Jaramillo* (1979) 98 Cal.App.3d 830, 836 [contusions and swelling constituted sufficient evidence of great bodily injury].) Of course, no two injuries are the same, but the quantity and severity of the injuries in this case were such that the jury could find them to be sufficiently great to satisfy the enhancement.

However, that is not the end of the analysis in this instance due to an unusual procedural quirk. At trial, the court inadvertently applied the great-bodily injury enhancement to count *1*, as opposed to count 2, which was the jury's finding. The court's error was brought to its attention, and the court subsequently struck the enhancement. However, it did not apply the enhancement to count 2. The enhancement was not applied to count 2 in the reporter's transcript, the abstract of judgment, or in the minutes.

Although neither party has brought this omission to our attention, the court's failure to impose the enhancement was an unauthorized sentence. Under section 1203.075, subd. (a)(6), the court had no discretion to strike the great bodily injury enhancement. That section lists a number of serious crimes, including rape, and states that a court "shall not" strike a jury's finding of great bodily injury inflicted in the commission of one of the

16

crimes. Accordingly, the court was required to impose the enhancement. "'The failure to impose or strike an enhancement is a legally unauthorized sentence subject to correction' [Citation], even if the correction results in a harsher punishment." (*In re Renfrow* (2008) 164 Cal.App.4th 1251, 1254.) Accordingly, we will remand with instructions to the court to impose the great bodily injury enhancement on count 2.

V.

ANY PROSECUTORIAL ERROR WAS HARMLESS

Jenks's final contention is that the prosecutor committed reversible error by disparaging defense counsel during closing argument. In particular, in reference to Jenks's testimony that he and V.E. had consensual sex, the prosecutor stated, "The defense attorney wants to make it look like, well, the defendant's story is a simple one because it's the truth. Apparently, a complete set of flat-out lies is no problem for the defense attorney." The court sustained defense counsel's objection that he was being attacked, stating, "Sustained. Move on." In response to a later motion for new trial, the court acknowledged that the prosecutor's comment was "disparaging" and "unprofessional," but the court concluded the comment did not affect the verdict.

We review the court's ruling for abuse of discretion. (*People v. Peoples* (2016) 62 Cal.4th 718, 792-793.) We find no abuse.

"A prosecutor's misconduct violates the Fourteenth Amendment to the United States Constitution when it 'infects the trial with such unfairness as to make the conviction a denial of due process.' [Citations.] In other words, the misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.' [Citation.] A prosecutor's misconduct that does not render a trial fundamentally unfair nevertheless

17

violates California law if it involves 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.'" (*People v. Cole* (2004) 33 Cal.4th 1158, 1202.)

"It is generally improper for the prosecutor to accuse defense counsel of fabricating a defense [Citations], or to imply that counsel is free to deceive the jury [Citation]. Such attacks on counsel's credibility risk focusing the jury's attention on irrelevant matters and diverting the prosecution from its proper role of commenting on the evidence and drawing reasonable inferences therefrom. [Citations.] [¶] Nevertheless, the prosecutor has wide latitude in describing the deficiencies in opposing counsel's tactics and factual account." (*People v. Bemore* (2000) 22 Cal.4th 809, 846.)

Undoubtedly, the prosecutor's single statement disparaging defense counsel was inappropriate and the court properly sustained an objection to it. However, to be reversible, Jenks must demonstrate prejudice. "Error with respect to prosecutorial misconduct is evaluated under *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*) to the extent federal constitutional rights are implicated, and *People v. Watson* (1956) 46 Cal.2d 818 [(*Watson*)], if only state law issues were involved. *Chapman* is implicated if the prosecutor's conduct renders the trial so fundamentally unfair that due process is violated." (*People v. Fernandez* (2013) 216 Cal.App.4th 540, 564.)

Here, we conclude the error was harmless under either standard. The prosecutor's comment was just one statement in a lengthy trial that began on May 24, 2023, and ended on June 6, 2023. The statement was brief, it was objected to, and the objection was sustained. Although the jury was not admonished, the fact that the judge sustained an objection to the comment sent the signal that the comment was not appropriate. The trial in this case came down to a credibility contest between Jenks and V.E. In that context,

18

the jury was likely to interpret the prosecutor's statement as a salvo against Jenks's account ("flat-out lies") rather than an attempt to introduce a new and irrelevant issue: defense counsel's credibility. Jurors generally treat "the prosecutor's comments as words spoken by an advocate in an attempt to persuade." (*People v. Clair* (1992) 2 Cal.4th 629, 663.)  There was simply no reasonable chance that this single brief comment swayed the outcome of the trial. Accordingly, any error by the prosecutor was harmless.

DISPOSITION

On remand, the court is instructed to stay the punishment on count 8, criminal threats, pursuant to section 654. The court is also instructed to impose the great bodily injury enhancement on count 2, consistent with the jury's finding. In all other respects, the judgment is affirmed.

SANCHEZ, ACTING P. J.

WE CONCUR:

MOTOIKE, J.

GOODING, J.